# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

DAVID CARSON, as parent and next friend of O.C.;
AMY CARSON, as parent and next friend of O.C.;
ALAN GILLIS, as parent and next friend of I.G.;
JUDITH GILLIS, as parent and next friend of I.G.;
TROY NELSON, as parent and next friend of A.N. and R.N.;
ANGELA NELSON, as parent and next friend of A.N. and R.N.;

*Plaintiffs-Appellants,*

v.

A. PENDER MAKIN, in her official capacity as
Commissioner of the Maine Department of Education,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the District of Maine, No. 1:18-cv-00327-DBH

_____

## BRIEF OF EDCHOICE AND MAINE HERITAGE POLICY CENTER
## AS AMICI CURIAE IN SUPPORT OF APPELLANTS

_____

LESLIE HINER
EDCHOICE
111 Monument Circle
  Suite 2650
Indianapolis, IN 46204
(317) 681-0745

*Counsel for EdChoice*

RUSSELL C. MENYHART
TAFT STETTINIUS &
  HOLLISTER LLP
One Indiana Square, #3500
Indianapolis, IN 46204
(317) 713-3500

*Counsel for EdChoice*

JOSHUA DUNLAP
PIERCE ATWOOD LLP
254 Commercial St.
Portland, ME 04101
(207) 791-1103

*Counsel for EdChoice &
Maine Heritage Policy Center*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, EdChoice and The Maine Heritage Policy Center (MHPC) are not-for-profit corporations. EdChoice is incorporated under the laws of Indiana and MHPC is incorporated under the laws of Maine, and both are organized under section 501(c)(3) of the Internal Revenue Code. Neither entity has a parent company and no publicly held corporation has an ownership interested in EdChoice or MPHC.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................... i

TABLE OF AUTHORITIES ............................................................ iv

INTEREST OF *AMICI CURIAE* .........................................................1

SUMMARY .................................................................................2

ARGUMENT ...............................................................................6

I.    Maine's history makes clear the unconstitutional basis for
its current town tuitioning prohibitions..........................................6

     A.   Maine Senator James Blaine's special influence on
school funding from 1875 to the 1980s................................................6

     B.   Parents deserve to choose the educational option
that is best for their children.................................................9

     C.   One by one, state courts have accepted the U.S. Supreme Court's
rejection of the fallacy underlying the Sectarian Exclusion............... 11

II.   Social science research reveals why parents seek school choice
and why educational services provided by religious entities
must not be excluded................................................................. 17

     A.   Research demonstrates that school choice improves
academic outcomes and long-term educational attainment
for participating students .................................................. 17

     B.   Parents consistently express a desire for school choice
and that having the option of sending their children to
religious schools is an important component of school choice.......... 21

     C.   Public school students exposed to school choice are
not harmed and have improved academic outcomes.......................... 26

    D. School choice has a positive impact on civic values and practices and on racial and ethnic integration ..................................... 27

CONCLUSION ................................................................................ 30

CERTIFICATE OF COMPLIANCE ................................................ 32

CERTIFICATE OF SERVICE ........................................................ 33

# TABLE OF AUTHORITIES

**Cases**

*Asociacion de Maestros v. Departamento de Educacion,*
  200 D.P.R 974 (P.R. 2018) ...................................................................................15

*Bush v. Holmes*,
  886 So. 2d 340 (Fla. Dist. Ct. App. 2004), *aff'd in part*, 919 So. 2d 392 (Fla. 2006).................................................................................................................................15

*Cain v. Horne,*
  202 P.3d 1178 (Ariz. 2009)..................................................................................15

*Duncan v. State,*
  102 A.3d 913 (N.H. 2014) ...................................................................................14

*Espinoza v. Mont. Dep't of Revenue,*
  2018 MT 306, 435 P.3d 603, *cert. granted*, 139 S. Ct. 2777 (2019)..................15

*Gaddy v. Dept. of Revenue*,
  802 S.E. 2d 225 (Ga. 2017)..................................................................................14

*Griffith v. Bower,*
  747 N.E. 2d 423 (Ill. App. 2001) .........................................................................14

*Hart v. State,*
  744 S.E.2d 281 (N.C. 2015)..................................................................................14

*Jackson v. Benson,*
  578 N.W.2d 602 (Wis. 1998)................................................................................15

*Louisiana Federation of Teachers v. State,*
  118 So. 3d 1033 (La. 2013)..................................................................................14

*Luthens v. Bair,*
  788 F. Supp. 1032 (S.D. Iowa 1992) ...................................................................14

*Magee v. Boyd,*
 175 So. 3d 79 (Ala. 2015) ....................................................................14

*McCall v. Scott*,
 199 So. 3d 359 (Fla. Dist. Ct. App. 2016) ...........................................14

*McCann on behalf of J.M. vs. York Sch. Dep't,*
 365 F. Supp. 3d 132 (D. Me. 2019) .....................................................25

*Meredith v. Pence,*
 984 N.E.2d 1213 (Ind. 2013) ...............................................................14

*Mitchell v. Helms*,
 530 U.S. 793 (2000) ................................................................................6

*Muller v. Allen*,
 463 U.S. 388 (1983) ..............................................................................14

*Niehaus v. Huppenthal,*
 310 P.3d 983 (Ariz. Ct. App. 2013) .....................................................14

*Oliver, Jr. v. Barresi,*
 No. CV-22013-2072, 2014 WL 12531242 (Okla. Dist. Ct. 2014) ................12, 13

*Oliver v. Hofmeister,*
 2016 OK 15, 368 P.3d 1270 (2016) ........................................13, 14, 15

*Schwartz v. Lopez,*
 382 P.3d 896 (Nev. 2016) ....................................................................14

*Taxpayers for Pub. Educ v. Douglas Cty. Sch. Dist.*,
 2015 CO 50, 351 P.3d 461, *cert. granted, judgment vacated*,
 137 S. Ct. 2327 (2017) .........................................................................15

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
 137 S. Ct. 2012 (2017) ...................................................................15, 16

*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002) ....................................................................9, 10, 13, 14, 15

**Statutes**

Okla Const. Art II, § 5 ...........................................................................................12

N. H. Rev. Stat. Ann. § 193:3 (2017) ......................................................................3

20-A M.R.S.A. § 2951 ......................................................................................*passim*

**Other Authorities**

Albert Cheng, Matthew M. Chingos, & Paul E. Peterson, *Experimentally Estimated
    Impacts of School Vouchers on Educational Attainments of Moderately and
    Severely Disadvantaged Students* (Program on Education Policy and
    Governance Working Paper Series, No. 19-02, 2019), *available at*
    http://sites.hks.harvard.edu/pepg/PDF/Papers/PEPG19_02.pdf .........................20

Andrew Catt & Evan Rhinesmith, *Why Indiana Parents Choose* (2017), *available
    at* https://www.edchoice.org/wp-content/uploads/2017/09/Why-Indiana-Parents-
    Choose-2.pdf .......................................................................................................23

Corey DeAngelis & Patrick Wolf, *Private School Choice and Crime: Evidence
    from Milwaukee*, 100 Soc. Sci. Q. 2302, *available at*
    http://onlinelibrary.wiley.com/doi/abs/10.1111/ssqu.12698 ....................... 28, 29

EdChoice, *ABCs of School Choice* (2019), *available at*
    http://www.edchoice.org/wp-content/uploads/2019/01/The-ABCs-of-School-
    Choice-2019-Edition.pdf .................................................................................3, 4

EdChoice, *America's School Choice Programs by Dates Enacted and Launched*,
    http://www.edchoice.org/school-choice/enacted-and-launched-table/ .................3

EdChoice, *Empirical Research Literature on the Effects of School Choice*,
    http://www.edchoice.org/wp-content/uploads/2015/07/3-2011-Win-Win-
    National-Study.pdf ...............................................................................17, 18, 22

EdChoice, *The 123s of School Choice: What the Research Says About Private School Choice Programs in America* (2019), *available at* https://www.edchoice.org/wp-content/uploads/2019/04/123s-of-School-Choice.pdf ...............................................................................................*passim*

Emma Findlen Leblanc, *We Belong Here: Eliminating Inequality in Education for Immigrants and Students of Color in Maine*, ACLU of Maine (2017), *available at* http://www.aclumaine.org/sites/default/files/webelonghere_report.pdf ............................................................................24, 25

Greg Forester, *A Win-Win Solution: The Empirical Evidence on School Vouchers* (2d ed. 2011), *available at* http://www.edchoice.org/wp-content/uploads/2015/07/3-2011-Win-Win-National-Study.pdf..................18, 19

Greg Forster, *A Win-Win Solution: The Empirical Evidence on School Choice* (3d ed. April 2013), *available at* http://www.edchoice.org/wp-content/uploads/2015/07/2013-4-A-Win-Win-Solution-WEB.pdf .....................19

Greg Forster, *A Win-Win Solution: The Empirical Evidence on School Choice* (4th ed. May 2016), *available at* http://www.edchoice.org/wp-content/uploads/2016/05/A-Win-Win-Solution-The-Empirical-Evidence-on-School-Choice.pdf................................................................................. 19, 27, 28

Jason Bedrick & Lindsey Burke, *Surveying Florida Scholarship Families* (2018), *available at* https://www.edchoice.org/wp-content/uploads/2018/10/2018-10-Surveying-Florida-Scholarship-Families-byJason-Bedrick-and-Lindsey-Burke.pdf...........................................................................................22

Jeff Barlis, *School Choice Scholarships "Saved" Bullying Victim,* Stepping Beyond the Scholarship (Dec. 11, 2017), http://blog.stepupforstudents.org/school-choice-scholarship-saved-bullying-victim/....................................................................................... 23, 24

Julie Trivitt & Patrick Wolf, *School Choice and the Branding of Catholic Schools*, 6 Educ. Finance & Pol'y 202 (2011) ..........................................................11, 30

Leslie Hiner, *Why I Sent My Children to a School of Another Faith*, The Heartland Institute (Dec. 25, 2013), https://www.heartland.org/news-opinion/news/why-i-sent-my-children-to-a-school-of-another-faith ....................................................10

Mark Paul Richard, *This Is Not a Catholic Nation: The Ku Klux Klan Confronts Franco-Americans in Maine*, 82 New England Q. 285 (June 2009) .................... 8

Maine Historical Society, *Item 1265: Ku Klux Klan Procession, Portland, ca. 1923*, Maine Memory Network, http://mainememory.net/artifact/1265 .............. 8

Maine State Legislature, *Proposed Constitutional Legislation 1820 - ,* http://legislature.main.gov/doc/502 ............................................................ 7, 8, 9

Maine Att'y Gen., *Opinion Letter on Constitutionality of L.D. 691, Chapter 431, Public Law 1979* (Jan. 7, 1980) ...................................................... 9, 12

Nat'l Center for Educ. Stat., *State Education Reforms, Table 4.7: States with voucher programs, by state: 2017*, https://nces.ed.gov/programs/statereform/tab4_7.asp .......................................... 3

Nat'l Const. Center, *15 Constitutional Amendments Proposed in Republican Convention Platforms,* Constitution Daily blog (July 18, 2016), http://constitutioncenter.org/blog/15-constitutional-amendments-proposed-in-republican-convention-platforms/ ........................................................................ 6

Nit-Noi Ricker, *Ellsworth Bullying Complaint Leads to Investigation*, Fox 22 WFVX Bangor (May 9, 2019), http://www.foxbangor.com/news/item/48070-ellsworth-bullying-complaint-leads-to-investigation .......................................... 25

Office of the Historian of the Dep't of State, *The Immigration Act of 1924 (The Johnson-Reed Act)*, http://history.state.gov/milestones/1921-1936/immigration-act ................................................................................................................... 7

Patrick J. Wolf et al., *School Vouchers and Student Outcomes: Experimental Evidence from Washington, D.C.*, 32 J. Pol'y Analysis & Mgmt. 246 (2013).... 18

Paul DiPerna & Michael Shaw, *Schooling in America* (2018), *available at* https://www.edchoice.org/wp-content/uploads/2018/12/2018-12-Schooling-In-America-by-Paul-DiPerna-and-Michael-Shaw.pdf ....................................... 21, 22

Zach Blanchard, *Maine Family Sues School Over Bullying,* NewsCenter Maine (Mar. 14, 2019), available at http://perma.cc/9TGB-26LX ................................. 25

EdChoice is a 501(c)(3) nonpartisan, nonprofit organization and a national leader in educational-choice research, legal defense and education, fiscal analysis, policy development, and educational training and outreach.[1] The mission of EdChoice is to advance educational freedom and choice for all as a pathway to successful lives and a stronger society. EdChoice believes that all families— regardless of race, origin, residence, or family income—should have a full and unencumbered opportunity to choose the schools and other educational resources that work best for their children. The public good is well served when children have a chance to learn at their maximum potential, regardless of the environment where that learning occurs—public or private, near or far, religious or secular. When children find their best fit for education and succeed, they will thrive as adults. They are our future.

The Maine Heritage Policy Center (MHPC) is a 501(c)(3) nonprofit, tax-exempt educational organization dedicated to freeing people from dependency, creating lasting prosperity, and redefining the role of government in the lives of Maine citizens. MHPC conducts detailed and timely research, develops public

---

[1] Neither party's counsel authored the brief in whole or in part. Neither party or party's counsel—nor any person except EdChoice, MHPC, and their members and counsel—contributed money intended to fund the preparation or submission of this brief.

policy solutions, educates the public, and engages with the legislature to foster a greater sense of liberty in Maine.

EdChoice and MHPC respectfully ask that the Court reverse the judgment of the United States District Court, District of Maine, and hold that 20-A M.R.S.A § 2951(2)'s exclusion of religiously affiliated schools from Maine's generally available town tuitioning program violates the Free Exercise, Establishment, Free Speech, and Equal Protection Clauses of the U.S. Constitution.

## SUMMARY

The Maine student-aid program, which excludes participation by religiously affiliated schools, was established in 1873 as the nation's second recognized school-choice program. Maine's school-choice program is called "town tuitioning" in recognition of the central role played by local units of government. Towns without their own schools pay tuition for local students to attend a school of their parents' choice, as long as that choice is a public school or a non-sectarian private school. That latter restriction has not always existed; at one time parents were allowed to choose a religiously affiliated private school under the program when parents deemed that to be the best option for their children.

Vermont established the nation's first town tuitioning student-aid program in 1869, just four years ahead of Maine, and that program also remains active today. New Hampshire established a similar town tuitioning student-aid program in 2017.

N.H. Rev. Stat. Ann. § 193:3 (2017). The United States Department of Education classifies these town tuitioning student-aid programs as "vouchers." Nat'l Center for Educ. Stat., *State Education Reforms, Table 4.7: States with voucher programs, by state: 2017*, https://nces.ed.gov/programs/statereform/tab4_7.asp.[2]

At least one state has enacted a new educational-choice program every year since 2003, and over 1.4 million students and families are currently being served by 65 school-choice programs in 29 states, the District of Columbia, and Puerto Rico. EdChoice, *ABCs of School Choice* (2019), *available at* https://www.edchoice.org/wp-content/uploads/2019/01/The-ABCs-of-School-Choice-2019-Edition.pdf (hereinafter ABCs of School Choice); EdChoice, *America's School Choice Programs by Dates Enacted and Launched*, https://www.edchoice.org/school-choice/enacted-and-launched-table/ (last visited Oct. 7, 2019). These programs include tax-credit scholarships, vouchers (including town tuitioning), education savings accounts, and individual tax credits or deductions.[3] ABCs of School Choice 3-4.

---

[2] The NCES report refers to Maine and Vermont's town tuitioning programs as vouchers. The latest report was published in 2017, prior to New Hampshire's re-establishment of its town tuitioning program, but it would presumably make the same classification regarding New Hampshire, as the programs are substantially similar.

[3] Vouchers give parents the freedom to choose a private school for their children, using all or part of the public funding set aside for their children's education. Tax-credit scholarships grant taxpayers full or partial tax credits when they donate to nonprofits that provide private school scholarships. Education savings accounts

Despite the growth in educational choice and research proving its value, children in 21 states, including those as ideologically and culturally diverse as California and North Dakota, New Mexico and Delaware, do not have similar options. What all four of these states share in common is Blaine amendments. These restrictive provisions, found in 37 state constitutions, exist to block sectarian or religiously affiliated schools from participating in publicly funded student-aid programs; they have effectively limited efforts to expand educational options to children in these 21 states.

Part I of this brief concisely summarizes the history of animus towards sectarian schools in Maine, the unconstitutional basis for their exclusion from town tuitioning programs, and the parental demand for neutral school-choice programs. It then describes the increasing trend in other states towards rejecting the legacy of James Blaine.

---

allow parents to withdraw their children from public district or charter schools and receive a deposit of public funds into government-authorized savings accounts with restricted, but multiple, educational uses. Individual tax credits and deductions allow parents to receive state income tax relief for approved educational expenses, which can include private school tuition, books, supplies, computers, tutors, and transportation. ABCs of School Choice 3-4. These programs are often collectively referred to as "school-choice programs" or "student-aid programs." "Educational choice" is a more expansive term that includes private choice programs, home schooling subsidies, and other means of enhancing educational options for all children.

As the research summarized in Part II of this brief demonstrates, the benefits of educational-choice programs extend beyond just the participating students and their families, although they are first and foremost. The community benefits from students who learn greater political tolerance and civic skills and exhibit increased future political participation and volunteerism. Even the businesses that ultimately will employ the participating students benefit from a better-educated workforce.

Critics have argued that the literature is not sufficiently clear on the benefits of educational choice, or alternatively that some studies have shown such benefits to be marginal. The gist of these arguments is that student-aid programs should not exist while any doubt remains as to their value—despite significant empirical research showing that educational choice increases learning opportunities for all children, and despite parents continuing to seek choice options for their children.

Maine's willingness to reject all religiously affiliated private schools from participating in its town tuitioning program is contrary to recent case law and ignores the fact that these schools provide quality education that parents seek out for their children.

# ARGUMENT

## I. Maine's history makes clear the unconstitutional basis for its current town tuitioning prohibitions.

### A. Maine Senator James Blaine's special influence on school funding from 1875 to the 1980s.

James G. Blaine, arguably Maine's most famous 19th century politician, worked relentlessly to ensure that states would not allow public funding to flow to sectarian schools, primarily with the goal of barring support for Catholic parochial schools at a time of "pervasive hostility" toward all Catholics. *Mitchell v. Helms*, 530 U.S. 793, 828 (2000). Blaine's battle to prohibit public funding for sectarian schools began with his introduction of federal legislation to amend the U.S. Constitution in 1875. When that failed, he gained national prominence by proposing to insert language into the Republican Party's national platform in 1876 "forbidding the application of any public funds or property for the benefit of any school or institution under sectarian control." Nat'l Const. Center, *15 Constitutional Amendments Proposed in Republican Convention Platforms*, Constitution Daily blog (July 18, 2016), https://constitutioncenter.org/blog/15-constitutional-amendments-proposed-in-republican-convention-platforms/.

Blaine's failed efforts on the national level were more successful when pursued for state-by-state adoption, and clauses inserted in many state constitutions in the late 1800s that prohibited public funds from going to sectarian schools

became commonly known as "Blaine Amendments." Blaine's discriminatory sectarian language was wholly unsuccessful in his home state in his own lifetime. However, the ghost of Blaine reappeared when attempts were made between 1923 and 1925 to insert anti-sectarian language into Maine's constitution. Maine State Legislature, *Proposed Constitutional Legislation 1820 - , at 18,* https://legislature.maine.gov/doc/502 (last visited Oct. 7, 2019). At that time, immigration had peaked, leading to federal enactment of immigration quotas. Office of the Historian of the Dep't of State, *The Immigration Act of 1924 (The Johnson-Reed Act)*, https://history.state.gov/milestones/1921-1936/immigration-act (last visited Oct. 7, 2019). Many immigrants to Maine were Catholics. The rise of immigration in large part facilitated the reinvigoration of the Ku Klux Klan in Maine and elsewhere, as illustrated by this picture of a Klan march in Portland, Maine, in 1923:



Maine Historical Society, *Item 1265: Ku Klux Klan Procession, Portland, ca. 1923,* Maine Memory Network, http://mainememory.net/artifact/1265 (last visited Oct. 7, 2019).

Legislative efforts to insert sectarian language into Maine's constitution began in 1923 with constitutional legislation proposing a prohibition on "appropriations for denominational, sectarian, parochial, or religious institutions and purposes." *Proposed Constitutional Legislation 1820 - , supra,* at 18. The bill failed, but it became a major issue in Maine's 1924 Republican gubernatorial primary when its author, Senator Ralph Brewster of Dexter, Maine, was chosen in a highly contentious election and ultimately, with the Klan's support, elected Governor of Maine. Mark Paul Richard, *"This Is Not a Catholic Nation": The Ku Klux Klan Confronts Franco-Americans in Maine*, 82 New England Q. 285, 295-296, 301 (June 2009).

Legislative efforts to craft a sectarian limitation were finally successful in 1925, when the Maine Legislature enacted a bill requiring a constitutional referendum with this language: "Shall the Constitution be Amended as Proposed by a Resolution of the Legislature, Prohibiting the Use of Public Funds for Other Than Public Institutions and Public Purposes?" *Proposed Constitutional Legislation 1820 - , supra,* at 19. However, when this question was put to the voters in a referendum in September 1926, Mainers decisively rejected the

amendment by a vote of 94,148 to 65,349. *Id.* The Ku Klux Klan's influence in Maine waned markedly thereafter.

Ironically, therefore, Maine's constitution has never contained a so-called Blaine Amendment. However, in 1980, Maine's Attorney General resurrected Blaine's discriminatory language. Maine Att'y Gen., Opinion Letter on Constitutionality of L.D. 691, Chapter 431, Public Law 1979 (Jan. 7, 1980), Appellant's App. 42-59. Borrowing language used during Maine's prior struggles with anti-Catholic animus, the Attorney General opined that allowing towns to pay tuition to send their students to schools that were "pervasively religious" was a violation of the U.S. Constitution's Establishment Clause. *Id.*, Appellants' App. at 59. The Maine legislature then codified this language excluding religious schools from its town tuitioning program as 20-A M.R.S.A. § 2951(2) (the "Sectarian Exclusion"). This marked the first time Blaine's language was codified into Maine law, notwithstanding the history of support for such language from anti-Catholic activists and hate groups in Maine.

**B.    Parents deserve to choose the educational option that is best for their children.**

Maine's Sectarian Exclusion suggests that any incidental advancement of a religious mission that is linked to a town tuitioning program causes such a program to be unconstitutional. This squarely conflicts with the U.S. Supreme Court's holding in *Zelman*, which, in upholding a Cleveland voucher program, stated, "The

incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributed to the individual and recipients, not the government, whose role ends with the disbursement of benefits." *Zelman*, 536 U.S. 639, 652 (2002).

The practical reality is that when a parent seeks a school that is the best fit for her child, it does not necessarily advance *any* religious mission. When a parent uses publicly funded student aid to send her child to a religiously affiliated school, her decision is to choose an educational environment that will help the child learn and be successful; the particular religion with which the school is affiliated may not be a deciding factor. *See, e.g.*, Leslie Hiner, *Why I Sent My Children to a School of Another Faith*, The Heartland Institute (Dec. 25, 2013), https://www.heartland.org/news-opinion/news/why-i-sent-my-children-to-a-school-of-another-faith. Parents have free will in student-aid programs and may choose religious, independent, or secular schools and educational resources. Even if that choice is guided in any way by religious belief, the exercise of the parents' (and child's) choice is not attributable to the government.

Those who argue that sectarian schools are so pervasively religious that the religious aspect of the school overrides the educational aspect falsely equate religiously affiliated schools with houses of worship. Supporters of the Sectarian Exclusion miss two important points:

1) children attending sectarian schools receive education aligned with educational standards set by the state and deemed acceptable by colleges and universities, and

2) children who attend sectarian schools may or may not be of the same faith, or any faith at all.

In 2008, a study was conducted to test the Catholic brand and the theory that people of faith will choose schools of another faith for their children. Julie Trivitt & Patrick Wolf, *School Choice and the Branding of Catholic Schools*, 6 Educ. Finance & Pol'y 202 (2011). The authors determined that parents "prefer private schools that provide high-quality academic programs and religious instruction, particularly, but not exclusively, in the parents' preferred religion." *Id.* at 205. They also found evidence that Catholic schools possess such a strong academic reputation that "many Protestant Christian families prefer a Catholic school as their private school of choice." *Id.*

This stands in stark contrast to the old anti-Catholic days of James Blaine and highlights the pernicious nature of Maine's archaic policy built on a historical foundation of animus towards religion.

### C. One by one, state courts have accepted the U.S. Supreme Court's rejection of the fallacy underlying the Sectarian Exclusion.

When Maine's attorney general decided that it was unconstitutional to allow religiously affiliated private schools to participate in the town tuitioning program,

he opined that courts in other states had "uniformly" declared that funding educational services for a child at sectarian schools offended the Establishment Clause. Me. Att'y Gen., Opinion Letter on Constitutionality of L.D. 691, Chapter 431, Public Law 1979 (Jan. 7, 1980), Appellant's App. at 58.

The reality is that most state courts do not hold this position. Indeed, an ever-increasing number of states have rejected their antiquated Blaine legacy. One of the more notable cases took place in Oklahoma, a state long considered to have one of the most restrictive Blaine amendments.[4] A voucher program for children with disabilities was signed into law by Governor Brad Henry in 2010, and then quickly challenged via a lawsuit filed by 12 taxpayers. The trial court initially ruled that "religiously affiliated" schools could participate in the voucher program, but "sectarian" schools could not, a true nod to the spirit of Blaine Amendments. *Oliver, Jr. v. Barresi*, No. CV-2013-2072, 2014 WL 12531242 (Okla. Dist. Ct. 2014). In an explanation with echoes of Blaine, the court used two universities to draw an arbitrary line between the concepts of "sectarian" and "religiously affiliated" schools: Southern Methodist University was allegedly "Methodist in name only," and therefore religious affiliated, while Notre Dame, a Catholic school

---

[4] "No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minster, or other religious teacher or dignitary, or sectarian institution as such." Okla. Const. Art. II, § 5.

whose president is a priest, was "a Catholic institution through and through," and therefore sectarian. Transcript of Proceedings of Aug. 28, 2014, *Oliver, Jr. v. Barresi*, No. CV-2013-2072, 2014 WL 12531242 (Okla. Dist. Ct. 2014).

On appeal, the Oklahoma Supreme Court reversed. *Oliver v. Hofmeister*, 2016 OK 15, ¶ 15, 368 P.3d 1270, 1274 (2016). The court explained in its decision that the purpose of the "no aid" clause is to protect the separation of church and state and keep churches free from the state's control, not to prevent "exposure to religious influence." *Id.*, 2016 OK 15, ¶ 20, 368 P.3d at 1275-76. It relied on guidance from the U.S. Supreme Court's decision in *Zelman*, even though the issue was whether Oklahoma's statutory language violated its *state* constitution. (In the case at hand, by contrast, the district court declined to follow *Zelman*'s guidance, even though the issue raised is whether Maine's statutory language violates the *federal* constitution.) The Oklahoma Supreme Court found that the voucher program for students with disabilities was "completely neutral" toward religion and a parent's independent decision controlled whether any funds would flow to a sectarian school. "We are satisfied that under this scenario, the State is not adopting sectarian principles or providing monetary support of any particular sect." *Id.*, 2016 OK 15, ¶ 26, 368 P.3d at 1277.[5]

---

[5] In a concurring opinion, Justice J. Taylor opined that funding a student-aid program was a simple contract regarding "services to a non-governmental entity. It

In considering a state constitutional challenge to a voucher program, the Indiana Supreme Court similarly found that "voucher program expenditures do not directly benefit religious schools but rather directly benefit lower-income families with school-children by providing an opportunity for such children to attend non-public schools if desired." *Meredith v. Pence*, 984 N.E.2d 1213, 1230 (Ind. 2013). The court held that the "prohibition against government expenditures to benefit religious or theological institutions does not apply to institutions and programs providing primary and secondary education." *Id.* at 1230 (Ind. 2013).

State or federal courts have upheld student-aid scholarship programs that include religiously affiliated private schools in 15 states and Puerto Rico. *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002); *Mueller v. Allen*, 463 U.S. 388 (1983); *Luthens v. Bair*, 788 F. Supp. 1032 (S.D. Iowa 1992); *Magee v. Boyd*, 175 So. 3d 79 (Ala. 2015); *Niehaus v. Huppenthal*, 310 P.3d 983 (Ariz. Ct. App. 2013); *McCall v. Scott*, 199 So. 3d 359 (Fla. Dist. Ct. App. 2016), *rev. denied*; *Gaddy v. Dep't of Revenue*, 802 S.E.2d 225 (Ga. 2017); *Griffith v. Bower*, 747 N.E.2d 423 (Ill. App. 2001); *Meredith v. Pence*, 984 N.E.2d 1213 (Ind. 2013), *Louisiana Fed'n of Teachers v. State*, 118 So. 3d 1033 (La. 2013); *Schwartz v. Lopez*, 382 P.3d 886 (Nev. 2016); *Duncan v. State*, 102 A.3d 913 (N.H. 2014); *Hart v. State*, 774 S.E.2d

---

has nothing to do with religion. It has everything to do with fee for service and a mutual benefit contract." *Id.*, 2016 OK 15, ¶ 4, 368 P.3d at 1278.

281 (N.C. 2015); *Oliver v. Hofmeister*, 2016 OK 15, 368 P.3d 1270 (2016); *Asoc. Maestros v. Depto. Educ.*, 200 D.P.R. 974 (P.R. 2018); *Jackson v. Benson*, 578 N.W.2d 602 (Wis. 1998).

A Montana Supreme Court ruling against that state's student-aid program is now on appeal before the U.S. Supreme Court. *Espinoza v. Mont. Dep't of Revenue,* 2018 MT 306, 435 P.3d 603 (2018), *cert. granted*, 139 S. Ct. 2777 (2019). Arizona's Supreme Court ruled against its voucher program, but then upheld an education savings account program created in response. *Cain v. Horne*, 202 P.3d 1178 (Ariz. 2009). Colorado ruled against a local school district's voucher program, in a decision vacated by the U.S. Supreme Court and remanded, but then the voucher program was rescinded by a new school board prior to resolving the case. *Taxpayers for Pub. Educ. v. Douglas Cty. Sch. Dist.*, 2015 CO 50, 351 P.3d 461, *cert. granted, judgment vacated*, 137 S. Ct. 2327 (2017). Florida ruled against their statewide voucher, but only as a violation of the uniformity clause. *Bush v. Holmes*, 886 So. 2d 340 (Fla. Dist. Ct. App. 2004), *aff'd in part*, 919 So. 2d 392 (Fla. 2006).

This long line of cases over the last two decades demonstrates a gathering consensus that neutral school-choice programs cannot exclude religiously affiliated schools. And of course in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), the U.S. Supreme Court reiterated that the First

Amendment does not permit states to punish the free exercise of religion: "The Free Exercise Clause protects against laws that impose[ ] special disabilities on the basis of . . . religious status." *Id.* at 2021 (internal quotation marks omitted). A state denying playground resurfacing grants to religiously affiliated applicants violates the Free Exercise Clause by forcing the religiously affiliated daycare to choose between "participat[ing] in an otherwise available benefit program or remain a religious institution." *Id.* at 2021-22.

Although a plurality of the Court limited *Trinity Lutheran* to its facts, *id.* at 2024 n.3, its reasoning is relevant to legal challenges to school-choice programs. When states exclude religious options from such programs, religiously affiliated schools are faced with the same choice as the daycare in *Trinity Lutheran*: participate in the program or retain their religious affiliation. Likewise, many qualifying families are forced to choose between participating in a program for which they qualify or attending the religiously affiliated school of their choice. This limits children's ability to find the best possible individual education while providing no discernable public benefit.

## II. Social science research reveals why parents seek school choice and why educational services provided by religious entities must not be excluded.

As the number of educational-choice programs and participants has increased nationwide, the body of empirical research on school choice has

similarly expanded. Studies of choice programs throughout the United States overwhelmingly reflect a common conclusion: choice leads to measurable educational benefits for most students. *See generally* EdChoice, *The 123s of School Choice: What the Research Says About Private School Choice Programs in America* (2019) (hereinafter 123s of School Choice), *available at* https://www.edchoice.org/wp-content/uploads/2019/04/123s-of-School-Choice.pdf.

A. **Research demonstrates that school choice improves academic outcomes and long-term educational attainment for participating students.**

School-choice programs are most compelling for their historical ability to improve academic outcomes. Several empirical studies have examined the effect of school choice on student performance using the random-assignment method, the "gold standard" of social science research.[6] 123s of School Choice 7. Of 16 empirical studies to date, 10 found choice improves student outcomes and 4 found no visible effect. EdChoice, *Empirical Research Literature on the Effects of School Choice*, slide 9, http://www.edchoice.org/school-choice/empirical-research-

_____

[6] Random-assignment studies are possible where there are more applicants for a choice program than there are slots, generally resulting in a random lottery for the slots. Students who win the lottery and are offered choice can be compared to those who were not offered choice. Any systematic differences can be attributed to the offer of choice alone, because nothing separates the group but the offer of choice and randomness. 123s of School Choice 14.

literature-on-the-effects-of-school- choice (last visited Oct. 7, 2019). Two analyses of Louisiana's voucher program found a negative average outcome for some or all groups of students. *Id.*

For example, a 2013 random-assignment study of Washington D.C.'s voucher program found statistically significant achievement gains of 4.8 scale score points in reading. Patrick J. Wolf et al., *School Vouchers and Student Outcomes: Experimental Evidence from Washington, D.C.*, 32 J. Pol'y Analysis & Mgmt. 246 (2013). The study also supported prior research from other scholars showing that "private schools provide students with an educational climate that encourages school completion either through the intervention and expectations of school faculty or by having similarly motivated and achieving peers." *Id.* at 265.

A 1998 random-assignment study of a City of Milwaukee program found that students who used vouchers scored 6 points higher in reading and 11 points higher in math than students in a control group that were not offered vouchers. Greg Forster, *A Win-Win Solution: The Empirical Evidence on School Vouchers* 9-10 (2d ed. 2011), *available at* http://www.edchoice.org/wp-content/uploads/2015/07/3-2011-Win-Win-National-Study.pdf. In 2001, a researcher studying the effect of school choice in a privately funded voucher program in Charlotte, North Carolina, found that voucher students scored six points higher on combined reading and math tests after one year. *Id.* at 10. In 2008,

another researcher reanalyzed the data from the Charlotte study, using a different method to account for students who were offered school choice but declined to exercise it. The second study found that the voucher students in fact had outperformed the control group by eight points in reading and seven points in math. *Id.*

A long-term study of a privately funded voucher program for low-income elementary school students in New York City in the late 1990s found that African-American students who were offered vouchers in elementary school were 20% more likely to attend college within three years of their expected high school graduation date. Greg Forster, *A Win-Win Solution: The Empirical Evidence on School Choice* 8 (3d ed. 2013), *available at* http:// www.edchoice.org/wp-content/uploads/2015/07/2013-4-A-Win-Win-Solution-WEB.pdf. They were also 25% more likely to attend college full-time and 130% more likely to attend a selective four-year college. *Id.* Three recent random-assignment studies of New York City voucher programs found that school choice has a positive effect on college enrollment and attainment rates for some or all participating students and no negative effect for any student group. Greg Forster, *A Win-Win Solution: The Evidence on School Choice* (4th ed. 2016) (hereinafter 2016 Forster Report), *available at* http://www.edchoice.org/wp-content/uploads/2016/05/A-Win-Win-Solution-The-Empirical-Evidence-on-School-Choice.pdf. The most recent analysis

of this program found significant effects on high school graduation and college enrollment rates among students from moderately disadvantaged households. Albert Cheng, Matthew M. Chingos, & Paul E. Peterson, *Experimentally Estimated Impacts of School Vouchers on Educational Attainments of Moderately and Severely Disadvantaged Students* (Program on Education Policy and Governance Working Paper Series, No. 19-02, 2019), *available at* https://sites.hks.harvard.edu/pepg/PDF/Papers/PEPG19_02.pdf.

As the aforementioned New York analyses illustrate, equally as important as academic improvement is what happens after secondary schooling is completed. Out of six studies of student attainment, four have found that private school-choice program participants experienced a positive increase in educational attainment, as measured by high school graduation rates, college enrollment, and college completion. 123s of School Choice 20. Two analyses found no visible difference, and none found negative effects for any groups of students. *Id.*

Overall, the empirical evidence demonstrates a largely positive effect of school choice on participating students, which logically leads to higher graduation rates and increased rates of post-secondary education. Such outcomes are the hallmark of responsible public policy. The empirical evidence as a whole supports the prudence of offering educational choice to families who believe their public school system is not the best option.

**B.    Parents consistently express a desire for school choice and that having the option of sending their children to religious schools is an important component of school choice.**

Parents know what they want for their children, but they often are not able to access the type of educational environment they most desire. EdChoice's comprehensive educational choice public opinion survey, conducted annually, has shown a consistent desire for private school options despite a large majority of children remaining in public district schools. Paul DiPerna & Michael Shaw, *Schooling in America* (2018), *available at* https://www.edchoice.org/wp-content/uploads/2018/12/2018-12-Schooling-In-America-by-Paul-DiPerna-and-Michael-Shaw.pdf. In the 2018 survey, when asked what type of school they would select if given the option, parents' first choice was private school (40%), followed by public district school (36%), public charter school (13%), and home schooling (10%). *Id.* at 19, 22. Given such parental aspirations, actual enrollment is quite remarkable: 82% in public district school, 10% in private school, 5% in public charter school, and 3% home school. *Id.* at 19- 20, 22. It is these kind of constituent desires that have led to an ever-increasing number of states implementing educational-choice initiatives to empower parents to better guide their children's education.

Parents are also clear about their desire to have the option of choosing religious schools. Parents participating in school-choice programs are generally

satisfied with their choices, many of which include religious schools. Of the 28 surveys of parents whose children participate in school-choice programs, 26 found positive outcomes for parental satisfaction. EdChoice, *Empirical Research Literature on the Effects of School Choice*, slide 19, http://www.edchoice.org/school-choice/empirical-research-literature-on-the-effects-of-school-choice (last visited Oct. 7, 2019). The largest-ever survey of parents participating in a private school-choice program found that a school's religious environment and instruction was the most important factor for parents choosing a school. Jason Bedrick & Lindsey Burke, *Surveying Florida Scholarship Families* 2 (2018), *available at* https://www.edchoice.org/wp-content/uploads/2018/10/2018-10-Surveying-Florida-Scholarship-Families-byJason-Bedrick-and-Lindsey-Burke.pdf. When Bedrick and Burke asked over 14,000 parents participating in Florida's tax-credit scholarship program which factors most influenced their decision to choose a particular school, 66% said "religious environment/instruction" and 52% said "morals/character/values instruction." *Id*. at 18. These two factors far outranked other considerations—the next three highest-ranked options were "safe environment" at 39%, "academic reputation" at 34%, and "small classes" at 31%. *Id.*

A similar survey conducted in Indiana, which has the nation's largest voucher program, also found moral/character instruction and religious environment

to be among the most important factors to parents. Andrew Catt & Evan Rhinesmith, *Why Indiana Parents Choose* 28 (2017), *available at* https://www.edchoice.org/wp-content/uploads/2017/09/Why-Indiana-Parents-Choose-2.pdf . Catt and Rhinesmith found that Indiana's voucher-recipient parents listed the following as most influencing their choice of school: academics (58%), morals/character/values instruction (53%), safe environment (53%), religious environment/instruction (48%), and small classes (47%). *Id.*

Parents who would choose religiously affiliated schools value religious environment, morals instruction, and a safe environment. This last desire is critically urgent for children who are subject to bullying in public schools, one common reason that parents seek out sectarian alternatives. A poignant example is the case of Valentin Mendez, who was born in Miami but fled the country to escape public schools, where he had been beaten, bullied, and traumatized. Upon learning of Florida's tax credit scholarship program which could fund Valentin's tuition at a private school, his mother brought him back home from Nicaragua and enrolled Valentin in the La Progresiva Presbyterian School in Little Havana. It took a year for Valentin to overcome flashbacks of the bullying he previously experienced in public schools, but La Progresiva embraced Valentin with the love that is part of their faith and educational system. Valentin began to learn and thrive, graduating with honors and a 3.78 weighted GPA. Jeff Barlis, *School*

*Choice Scholarships "Saved" Bullying Victim,* Stepping Beyond the Scholarship (Dec. 11, 2017), https://blog.stepupforstudents.org/school-choice-scholarship-saved-bullying-victim/.

There are far too many children like Valentin in Maine who, but for the Sectarian Exclusion, may also be healed by the loving environment available in religious private schools. A recent report by the ACLU of Maine chronicled incidences of bullying in Maine by speaking directly to students, parents, community leaders, educators, and administrators in sixteen towns across the state. Emma Findlen Leblanc, *We Belong Here: Eliminating Inequality in Education for Immigrants and Students of Color in Maine*, ACLU of Maine (2017), *available at* https://www.aclumaine.org/sites/default/files/webelonghere_report.pdf. The report primarily focused on immigrant children, but noted that other children are subjected to the same bullying. Their experiences align with those experienced by Valentin in Florida, with children making statements like, "They make us ashamed to be multilingual," and "I dropped out two years ago. No one wanted me there. I asked for help. I came after school. But they never helped me. I want to get my education, just not here." *Id.* at 16.

This concern is supported by other recently reported acts of bullying in Maine's public schools:

- Bullying of a York High School student for multiple years culminated in physical violence, "including pushing him into a glass door, throwing him against a locker and pounding his head against it multiple times, and punching him repeatedly" resulting in a major concussion, dislocated jaw, and post-traumatic stress disorder. Order on York School Department's Motion to Dismiss, *McCann on behalf of J.M. vs. York Sch. Dep't*, 365 F. Supp. 3d 132 (D. Me. 2019).

- A suicide of a 12-year-old led to the arrest of two teens accused of bullying and a lawsuit against Gorham School District by the deceased student's father. Zach Blanchard, *Maine Family Sues School Over Bullying*, NewsCenter Maine (Mar. 14, 2019), https://perma.cc/9TGB-26LX.

- The mother of an Ellsworth sixth grader was forced to withdraw her daughter from school after "She got called the N-word and the school didn't call me." Nit-Noi Ricker, *Ellsworth Bullying Complaint Leads to Investigation*, Fox 22 WFVX Bangor (May 9, 2019), https://www.foxbangor.com/news/item/48070-ellsworth-bullying-complaint-leads-to-investigation/.

Although the ACLU of Maine, publisher of the *We Belong Here* report, is in opposition to Appellants in this case, these children could find a welcoming, safe

environment in a private religious school where children are valued and loved by people of faith, just like Valentin did. The Sectarian Exclusion currently prevents such Maine students from having this option.

### C. Public school students exposed to school choice are not harmed and have improved academic outcomes.

A philosophical underpinning of school choice is that it should improve both private and public school educations due to the increased competition it fosters. When public schools know that students can use educational-choice funding to enroll elsewhere, they have a powerful incentive to improve performance to retain and attract students. There is now sufficient rigorous academic research to support this theory. Empirical studies show that the positive effect of school choice on public school academic performance is at least as strong as the effect on children who are offered choice. Of 26 studies that used appropriate methodological techniques, 24 have found that school choice improves public schools, one found no visible effect, and one found a negative effect. 123s of School Choice 32.

This body of research uses various statistical tools—such as measuring distance to choice schools, computing density of choice schools, and estimating the percentage of students in a district or public school eligible for choice programs— to determine competitive pressures. Many of these studies examined Milwaukee's voucher program or Florida's tax-credit scholarship programs, two of the nation's longest-running programs. *Id.* Several recent studies have provided intriguing (and

always positive) results. For example, a study of Florida's tax-credit scholarship program used novel variables to measure private school competition (e.g., using the number of nearby houses of worship as a proxy for private school competition). 2016 Forster Report 17. It found a positive effect on public schools in both reading and math for five separate measures of private school competition. *Id.* Another study found that when low-performing schools became eligible for vouchers, changes in the schools' institutional practices resulted in improved student performance. *Id.* Overall, the overwhelming majority of studies have found that school choice positively impacts the academic performance of public schools exposed to choice. 123s of School Choice 32. These studies demonstrate that if Maine's goal is to provide the best possible educational options to its students, then allowing town tuitioning program funds to flow to sectarian schools will increase the educational quality at both those schools and public and private schools competing for the same funds.

> ### D. School choice has a positive impact on civic values and practices and on racial and ethnic integration.

Another line of research examines the impact of school choice on civic values and practices. To date, 11 studies have been completed: 6 found school choice has a positive impact, 5 studies showed no visible impact, and no study has shown school choice to have a negative effect. 123s of School Choice 40. In one study, researchers found higher levels of political tolerance, civic skills, future political

participation, and volunteerism in participants in Milwaukee's voucher program when compared to public school students. 2016 Forster Report 31. The study also found the positive effect to be significantly stronger in religious schools than in other private schools. *Id.*

A 2019 study of the same program analyzed its long-term impact on students' criminal records. Corey DeAngelis & Patrick Wolf, *Private School Choice and Crime: Evidence from Milwaukee,* 100 Soc. Sci. Q. 2302-2315 (2019), *available at* https://onlinelibrary.wiley.com/doi/abs/10.1111/ssqu.12698. It found a correlation between long-term participation in the voucher program and decreased criminal charges and convictions, especially for young men. *Id.* The longer students remained in the voucher program, the stronger the correlation across multiple measures of criminal records. *Id.* Males who remained in the program throughout high school had better outcomes then their peers in public schools, including a 22% reduction in felonies, a 29% reduction in drug offenses, and a 41% reduction in theft. *Id.*

A follow-up study was conducted concerning paternity. The authors found that student exposure to Milwaukee's voucher program in the 8th and 9th grades is predictive of 38% fewer paternity suits by ages 25–28. Corey DeAngelis & Patrick Wolf, *Private School Choice and Character: More Evidence from Milwaukee*

(Univ. Ark. Dep't of Educ. Reform (EDRE), Working Paper No. 2019-03), *available at* https:// ssrn.com/abstract=3335162.

Studies of the racial and ethnic composition of private and public schools have also shown that school choice improves integration. The study of educational integration can be conducted by a variety of methods, yet six out of seven studies using student-level data have found that school choice has a positive impact on integration, while one study showed no effect. 123s of School Choice 48.

Social science research has produced statistically valid, reliable reasons why parents favor school choice and why including private religious schools is important to parents. The human equation substantiates all that research: parents use student-aid programs to fund their children's education, often at religiously affiliated schools, when their children are not thriving and need a school that is a better fit for their individual needs. Religious schools are often chosen because, in addition to meeting or exceeding the state's educational standards, they offer benefits that public schools cannot provide, like spiritual guidance, alignment with a faith-based worldview in general conversation and actions, safety, and small schools that quietly focus on each student as an individual learner, being respectful of each child's faith. This is particularly urgent for students subjected to the type of bullying described above. Generally available student-aid programs can provide

access to this type of learning environment, if the parent decides that is what her child needs.

## CONCLUSION

Allowing religiously affiliated schools to participate in generally available public student-aid programs promotes religious tolerance and advances the value of education, particularly when a child of one faith, or no faith, attends a school of a different belief. This is confirmed by the Trivitt and Wolf study, cited *supra*, Part I.B., that found that parents may seek a school for quality academics and religious atmosphere regardless of whether parents share the specific faith traditions of that school. Trivitt & Wolf, *School Choice and the Branding of Catholic Schools,* 6 Educ. Finance & Pol'y 202. Children should be able to attend a safe school that values the child and provides real learning opportunities not available in the child's zoned or otherwise available public school.

Maine's Sectarian Exclusion is a remnant of its troubling history of the Ku Klux Klan, religious bigotry, and intolerance. It is out of step with prevailing constitutional jurisprudence at both the state and federal levels. This Court should honor Appellants' request to permanently enjoin the statutory provision giving life to the Sectarian Exclusion and close the book on this remnant from Maine's past.

October 7, 2019                         Respectfully submitted,

*/s/ Russell Menyhart*

RUSSELL MENYHART
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, #3500
Indianapolis, IN 46204
(T) 317 713-3500
(F) 317-713-3699
rmenyhart@taftlaw.com

LESLIE HINER
EDCHOICE
111 Monument Circle, Suite 2650
Indianapolis, Indiana 46204
(T) 317-681-0745
(F) 317-681-0945
leslie@edchoice.org

JOSHUA D. DUNLAP
PIERCE ATWOOD LLP
254 Commercial Street
Portland, Maine 04101
(T) 207-791-1103
(F) 207-791-1350
jdunlap@pierceatwood.com

# CERTIFICATE OF COMPLIANCE

According to the word-processing system used to prepare the foregoing motion (Microsoft Word 2016), this brief complies with Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,438 words, excluding the portions exempted by Rule 32(f).

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Russell Menyhart*
Russell Menyhart

**CERTIFICATE OF SERVICE**

On October 7, 2019, a copy of the foregoing brief was electronically served

on the following via the notice of docket activity generated by the Court's CM/ECF

system:

Jeffrey Thomas Edwards, jedwards@preti.com
Timothy Keller, tkeller@ij.org
Arif Panju, apanju@ij.org
Lea Patterson, lepatterson@firstliberty.org
Jonathan R. Whitehead, jon@whiteheadlawllc.com
Michael K. Whitehead, mike@thewhiteheadfirm.com
*Counsel for Appellants-Plaintiffs*

Sara A. Forster, sarah.forster@maine.gov
Christopher C. Taub, Christopher.c.taub@maine.gov
*Counsel for Appellee*

Julia M. Lipez, Julia.lipez@usdoj.gov
Eric W. Treene, eric.treene@usdoj.gov
*Counsel for United States, Interested Party*

Emma Bond, ebond@aclumaine.org
Sarah Goetz, goetz@au.org
Zachary Heiden, zheiden@aclumaine.org
Richard Brian Katskee, katskee@au.org
Alexander Joseph Luchenitser, luchenitser@au.org
Daniel Mach, dmach@aclu.org
Heather L. Weaver, hweaver@aclu.org
*Counsel for American Civil Liberties Union, American Civil Liberties Union of
Maine, American United for Separation of Church and State, James Torbert, Theta
Torbert, and Susan Marcus, Interested Parties*

Stephen C. Whiting, steve@whitinglawfirm.com
*Counsel for Agudath Israel of America, Interested Party*

Eric A. Harrington, eharrington@nea.org
Kristen Hollar, khollar@nea.org

Andrew T. Mason, amason@maineea.org
*Counsel for National Education Association & Maine Education Association,*
*Interested Parties*

Jasmine Bolton, jasmine.bolton@splcenter.org
Jessica Levin, jlevin@edlawcenter.org
Andrew T. Mason, amason@maineea.org
Zoe M. Savitsky, zoe.savitsky@splcenter.org
David G. Sciarra, dsciarra@edlawcenter.org
*Counsel for Public Funds Public Schools, Interested Party*

*/s/ Russell Menyhart*
Russell Menyhart