No. 19-1746

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

DAVID CARSON, as parent and next friend of O.C.;
AMY CARSON, as parent and next friend of O.C.;
ALAN GILLIS, as parent and next friend of I.G.;
JUDITH GILLIS, as parent and next friend of I.G.;
TROY NELSON, as parent and next friend of A.N. and R.N.;
ANGELA NELSON, as parent and next friend of A.N. and R.N.,
*Plaintiffs-Appellants*,

v.

A. PENDER MAKIN, in her official capacity as
Commissioner of the Maine Department of Education,
*Defendant-Appellee*.

_____

On Appeal from the United States District Court for the District of Maine

_____

**BRIEF OF EDUCATION AND CIVIL RIGHTS ORGANIZATIONS AS
*AMICI CURIAE* SUPPORTING AFFIRMANCE**

_____

Alice O'Brien
Eric Harrington
Kristen Hollar
National Education Association
1201 16th Street, N.W.
Washington, D.C. 20036
202-822-7035

*Counsel for Amici Curiae*

[Additional *Amici* Listed on Inside Cover]

Judith Rivlin
American Federation of State, County
and Municipal Employees, AFL-CIO
1625 L St N.W.
Washington, DC 20036
202-775-5900

Jennifer Mathis
Bazelon Center for Mental
Health Law
1101 15th St N.W. #1212
Washington, D.C. 20005
202-467-5730

Center for Law and Education
1875 Connecticut Ave N.W. # 510
Washington, D.C. 20009
202-986-3000

Council of Administrators of
Special Education
101 Katelyn Circle, Suite E
Warner Robins, GA 31088
202-812-8113

Jennifer Reisch
Equal Rights Advocates
1170 Market St., Suite 700
San Francisco, CA 94102
415-575-2384

GLSEN
1012 14th St N.W. #1105
Washington, D.C. 20005
202-621-5815

Paul D. Castillo
Lambda Legal Defense and Education
Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219
214-302-2216

Andrew T. Mason
General Counsel
Maine Education Association
35 Community Drive
Augusta Maine 04330
207-622-5866

Sunu Chandy
National Women's Law Center
11 Dupont Circle, N.W. # 800
Washington, D.C. 20036
202-588-5180

Southern Education Foundation
101 Marietta St., N.W., Suite 1650
Atlanta, GA 30303
404-991-6777

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amici* certify that they are non-profit

corporations. None of them have parent corporations, no publicly held corporation

has an ownership interest in them, and they do not issue any stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................. i

Table of Authorities ........................................................................ iii

*Amici's* Statement of Interest ...............................................................1

Introduction ..................................................................................5

I.      Maine Designed the Tuition Program to Advance Its Interest in Ensuring that Its Constitutionally Required System of Schools Is Accountable, Inclusive and Free from Discrimination .....................7

II.      Forcing Maine to Fund Sectarian Schools Would Undermine Its Interest in Ensuring Its Schools Are Accountable, Inclusive and Free from Discrimination ............................................................... 18

Conclusion ................................................................................. 27

Certificate of Compliance ............................................................... 28

Certificate of Service ..................................................................... 29

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Abington School District v. Schempp,*
374 U.S. 203 (1963)...................................................................................9

*Ambach v. Norwick,*
441 U.S. 68 (1979)....................................................................................9

*Anderson v. Town of Durham,*
No. CIV.A. CV-02-480, 2003 WL 21386768 (Me. Super. May 14,
2003) ........................................................................................................6

*Anderson v. Town of Durham,*
895 A.2d 944 (Me. 2006).........................................................................6

*Bagley v Me. Dep't. of Educ.,*
No. CV-97-484, 1998 WL 35550607 (Me. Super. Apr. 20, 1998) ......................5

*Bagley v. Raymond Sch. Dep't.,*
728 A.2d 127 (Me. 1999).........................................................................5

*Bethel Ministries v. Salmon,*
No. 19-cv-01853 (filed D. Md. June 24, 2019) ...................................20

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983)................................................................................13

*Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.,*
347 U.S. 483 (1954)..........................................................................8, 13

*Obergefell v. Hodges,*
135 S. Ct. 2584 (2015).......................................................................17, 25

*Doe v. Boyertown Area Sch. Dist.,*
897 F.3d 518  (3d Cir. 2018) ...............................................................16

*Doe v. Reg'l Sch. Unit 26,*
86 A.3d 600 (Me. 2014)..........................................................................13

*Eulitt ex rel. Eulitt v. Me. Dep't of Educ.,*
386 F.3d 344 (1st Cir. 2004)............................................................... 5-6, 8

*Eulitt v. Me. Dep't of Educ.*,
307 F. Supp. 2d 158 (D. Me. 2004) ..................................................................5

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
565 U.S. 171 (2012) ......................................................................................21

*Hunter ex rel. Brandt v. Regents of Univ. of California*,
190 F.3d 1061 (9th Cir. 1999) ......................................................................14

*Lawrence v. Texas*,
539 U.S. 558 (2003)................................................................................. 25-26

*Locke v. Davey*,
540 U.S. 712 (2004)........................................................................................6

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018)..................................................................................13

*Meyer v. Nebraska*,
262 U.S. 390 (1923)........................................................................................8

*N.L.R.B. v. Catholic Bishop of Chicago*,
440 U.S. 490 (1979)......................................................................................21

*Olmstead v. L.C.*,
527 U.S. 581 (1999)......................................................................................15

*People v. DeJonge*,
501 N.W.2d 127 (Mich. 1993).......................................................................22

*Plyler v. Doe*,
457 U.S. 202 (1982)..................................................................................8, 17

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)......................................................................................13

**Page(s)**

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)......................................................................................21

*State ex rel. Nagle v. Olin*,
415 N.E.2d 279 (Ohio 1980) ......................................................................22

*Strout v. Albanese*,
178 F.3d 57 (1st Cir. 1999)............................................................................5

*Strout v. Comm'r, Me. Dep't of Educ.*,
13 F. Supp. 2d 112 (D. Me. 1998) .................................................................5

*Surinach v. Pesquera De Busquets*,
604 F.2d 73 (1st Cir. 1979).........................................................................22

*Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L*,
135 F.3d 694 (10th Cir. 1998) ...............................................................21, 26

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. ___, 137 S. Ct. 2012 (2017)............................................................6

*United States v. Windsor*,
570 U.S. 744 (2013).............................................................................. 25-26

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017) ....................................................................16


**Statutes**

Me. Const. art. VIII, Pt. 1, § 1 ...........................................................................5, 9

Me. Rev. Stat. tit. 5, § 4552 ...............................................................................12

Me. Rev. Stat. tit. 5, § 4553 ......................................................................... 12-13

**Page(s)**

Me. Rev. Stat. tit. 5, § 4601 ......................................................................13

Me. Rev. Stat. tit. 20-A, § 2701 ................................................................10

Me. Rev. Stat. tit. 20-A, § 2901 ...........................................................11, 12

Me. Rev. Stat. tit. 20-A, § 2902 ...........................................................11, 12

Me. Rev. Stat. tit. 20-A, § 2906 ..................................................................2

Me. Rev. Stat. tit. 20-A, § 2951 ..........................................................*passim*

Me. Rev. Stat. tit. 20-A, § 2952 ................................................................12

Me. Rev. Stat. tit. 20-A, § 2954 ................................................................12

Me. Rev. Stat. tit. 20-A, § 5203 ................................................................10

Me. Rev. Stat. tit. 20-A, § 5204 ................................................................10

Me. Rev. Stat. tit. 20-A §§ 6352-6358 ......................................................12

**Other Authorities**

Megan Austin, R. Joseph Waddington, & Mark Berends, *Voucher Pathways and Student Achievement in Indiana's Choice Scholarship Programs,* RSF: Russell Sage Foundation Journal of the Social Sciences 5(3): 20-40 (May 2019), http://bit.ly/2WNTYp6 .....................................................................20

Bangor Christian Schools, *Student Handbook* (Jul. 30, 2019), http://bit.ly/2NqGnRP......................................................................23

Calvary Christian Academy, *School Handbook 2018-2019,* https://bit.ly/2W9C5ji ................................................................ 22-23

Centers for Disease Control and Prevention, *Lesbian, Gay, Bisexual, and Transgender Health*, http://bit.ly/2JUe2AU ..................................................16

Suzanne E. Eckes, Julie Mead & Jessica Ulm, *Dollars to Discriminate: The (Un)intended Consequences of School Vouchers*, Peabody J. of Educ., 91:4 537-558 (Aug. 2016), http://bit.ly/2odFulO ..................................................................19

David Figlio & Krzysztof Karbownik, *Evaluation of Ohio's EdChoice Scholarship Program: Selection, Competition, and Performance Effects*, Thomas B. Fordham Institute (July 2016), http://bit.ly/2MEOQ3j..................................................................20

Mark L. Hatzenbuehler, *et al.*, *Stigma As a Fundamental Cause of Population Health Inequalities*, 103:5 Am. J. Pub. Health 813 (2013), http://bit.ly/2NZ1s4X ....................................................17

Anne M. Hocutt, *Effectiveness of Special Education: Is Placement the Critical Factor?*, 6 Future of Children 77 (1996), http://bit.ly/32lPd7z ..................................................................15

Rebecca Klein, *These Schools Get Millions Of Tax Dollars To Discriminate Against LGBTQ Students,* Huffington Post (Dec. 17, 2017), http://bit.ly/31DfttI ....................................................19

Jenifer K. McGuire, *et al.*, *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, 39 J. Youth & Adolescence 1175 (2010)................................... 15-16

Me. Dep't of Educ., *Student Enrollment Data, Private School Data October 1 Counts* 2017/18, https://bit.ly/2CsDxpl..............................................9

Me. Dep't of Educ., *Student Enrollment Data, Public School Data October 1 Counts* 2018/19, https://bit.ly/2CsDxpl..............................................10

Me. Dep't. of Educ., *Private School Approval*, https://bit.ly/2Crl3p4 ....................10

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Me. Dep't. of Educ., *Private School Approval, Annual School Approval Report*, https://bit.ly/2Crl3p4 .................................................. 11

Jonathan N. Mills & Patrick J. Wolf, *The Effects of the Louisiana Scholarship Program on Student Achievement After Four Years*, Univ. of Arkansas EDRE Working Paper 2019-10 (April 23, 2019), http://bit.ly/2PaL4Ac .................................................. 20

Nat'l Ass'n of Sch. Psychologists & Gender Spectrum, *Gender Inclusive Schools: Policy, Law, and Practice* (2016), http://bit.ly/2Nl0TDh .................................................. 16

Nat'l Coal. for Pub. Educ., *Vouchers Lack Accountability and Fund Poor Quality Schools*, http://bit.ly/2JdBdGm .................................................. 19

Orly Rachmilovitz, *No Queer Child Left Behind*, 51 U.S.F. L. Rev. 203 (2016), http://bit.ly/2PUmaVW .................................................. 15

Stephen T. Russell, *et al.*, *Safe Schools Policy for LGBTQ Students*, 24 Social Policy Report, no. 4 (2010), http://bit.ly/33loLMI .................................................. 16

Temple Academy, *Parent/Student Handbook 2018-2019,* https://bit.ly/2H8JziO .................................................. 23

Kathleen Whitbread, *What Does the Research Say About Inclusive Education?*, Wrightslaw (1998-2019), https://goo.gl/K6TzL6 .................................................. 15

*Amici* are committed to ensuring that public education remains the cornerstone of our nation's social, economic, and political structure, and that children of all backgrounds have the right to a public education that gives them a meaningful opportunity to succeed in school and in life. *Amici* also respect the decision of individuals, at their own expense, to educate their children in privately supported, non-segregated, private schools. But *amici* oppose using public funds to subsidize private sectarian schools—as the appellants advocate in this case—because doing so undermines public education and the State's interest in ensuring that publicly funded schools are subject to robust oversight and free from discrimination. *Amici* submit this brief to explain why Maine has a critical interest in limiting the Maine Tuition Program to nonsectarian private schools.

The National Education Association is a national membership organization with over three million educators who serve our nation's students in public school districts, colleges, and universities. The Maine Education Association is NEA's state affiliate in Maine, representing over 25,000 educators. Since its founding over

---

[1] Pursuant to Fed. R. App. P. 29(a), *amici* state that the parties have consented to the filing of this brief.  *Amici* furtherstate that (i) no party's counsel authored this brief in whole or in part; (ii) no party or party's counsel contributed money to fund the preparation or submission of this brief; and (iii) no person other than *amici* and their counsel contributed money to fund the preparation or submission of this brief.

a century and a half ago, NEA and its affiliates have worked to create, expand and strengthen the quality of public education available to all children—including by defending, in several prior cases, the Maine statute at issue in this case.

The Lambda Legal Defense and Education Fund, Inc. is the nation's oldest and largest nonprofit legal organization committed to achieving full recognition of the civil rights of LGBTQ people and people living with HIV through impact litigation, education, and public policy work. Lambda Legal has litigated numerous cases, either as party counsel or *amicus curiae*, concerning the obligation of schools to protect students from discrimination, violence, and censorship at school on the basis of sexual orientation and gender identity.

The Judge David L. Bazelon Center for Mental Health Law is a national nonprofit advocacy organization that has advanced the rights of individuals with mental disabilities for over four decades. Through litigation, policy advocacy, training and education, the Center promotes the rights of individuals with mental disabilities to participate equally in all aspects of society. Ensuring that children with disabilities are provided a free appropriate public education and equal educational opportunity is a central part of the Bazelon Center's mission.

The National Women's Law Center is a nonprofit legal advocacy organization dedicated to the advancement and protection of the legal rights of women and girls—including those who face multiple and intersecting forms of

discrimination. NWLC has participated as counsel or *amicus curiae* in a range of cases to secure equal treatment and opportunity for women and girls, including cases concerning whether protections against sex discrimination include protections against discrimination based on sexual orientation and gender identity.

GLSEN is a nonprofit education organization dedicated to improving school experiences and learning environments for all students, regardless of their sexual orientation, gender identity, and gender expression. Throughout the nation, GLSEN collaborates with teachers, students, schools, districts, and state leaders to advance evidence-based solutions to improve school climate and culture.

The Council of Administrators of Special Education is the largest of the eighteen divisions of the Council for Exceptional Children. CASE provides leadership, advocacy, and professional development to more than 4,500 administrators who work on behalf of students with disabilities and their families in public and private school systems and institutions of higher education.

The American Federation of State, County and Municipal Employees, AFL-CIO is a national union of 1.4 million members. AFSCME's members serve in hundreds of occupations across the nation in both the public and private sectors, including in public schools. AFSCME's mission includes promoting fair treatment of all working people and their families, including the right to a public education free from discrimination.

The Southern Education Foundation is a nonprofit foundation committed to advancing education justice for students of color and low-income students. Although SEF primarily works in southern states, its mission includes opposing any public funding of separate, unequal systems of private schools that operate under separate anti-discrimination, admissions, and accountability requirements.

Equal Rights Advocates is a national nonprofit legal advocacy organization dedicated to protecting and expanding economic and educational access and opportunities for women and girls. ERA pursues gender justice through engaging in high-impact litigation, legislative advocacy, and other efforts aimed at eliminating gender discrimination in education and employment.

The Center for Law and Education, Inc. is a nonprofit resource and support organization that works with families, advocates, and educators to improve the quality of education for all students, and in particular, indigent public school students. CLE focuses on bringing civil rights and school reform together to challenge systemic barriers that discriminate against and impede learning for economically disadvantaged students, students of color, English learners, students with disabilities, and LGBTQ+ students.

The Maine Constitution, like other state constitutions, contains an education article that affirmatively obligates the Maine Legislature ("State") to ensure "suitable provision . . . for the support and maintenance of public schools" across the state. Me. Const. art. VIII, Pt. 1, § 1. In Maine, most school administrative units ("SAUs") maintain their own public schools. But to address the limited circumstance where SAUs do not maintain public schools for all grade levels due to geographic remoteness or historical reasons, the State has fulfilled its constitutional duty by enacting a carefully constructed system to allow SAUs without their own schools to send their students to public schools in other districts or use approved, state regulated non-sectarian private schools to deliver public education to Maine students according to state standards.

In eight separate rulings on the Maine Tuition Program ("MTP"), Me. Rev. Stat. tit. 20-A, § 2951 *et seq.*, the state and federal courts have upheld the State's determination, codified at Me. Rev. Stat. tit. 20-A, § 2951(2), that public MTP funds should only flow to private schools that are non-sectarian.[2] Nothing in the

---

[2] *Strout v. Comm'r, Me. Dep't of Educ.*, 13 F. Supp. 2d 112 (D. Me. 1998), *aff'd sub nom. Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999); *Bagley v Me. Dep't. of Educ.*, No. CV-97-484, 1998 WL 35550607, at *1 (Me. Super. Apr. 20, 1998), *aff'd sub nom. Bagley v. Raymond Sch. Dep't.*, 728 A.2d 127 (Me. 1999); *Eulitt v. Me. Dep't of Educ.*, 307 F. Supp. 2d 158 (D. Me. 2004), *aff'd on other grounds sub nom. Eulitt ex rel. Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004);

Supreme Court's narrowly-worded decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, 137 S. Ct. 2012 (2017), undermines those prior rulings, as that decision recognized that there is "'play in the joints between what the Establishment Clause permits and the Free Exercise Clause compels," *id.* at 2019 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004) (cleaned up)), and left intact the Supreme Court's recognition in *Locke*'s "that state entities, in choosing how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so," *Eulitt*, 386 F.3d at 355. *Amici* leave to the Appellee the full development of these dispositive arguments.

*Amici* submit this brief to explain how the MTP as presently constituted not only continues to address the State's "legitimate concerns about excessive entanglement," *Eulitt*, 386 F.3d at 355, it advances state interests of the highest order. In order to effectively carry out its bedrock state constitutional obligation to provide a quality education to all school-age children, Maine exercises robust oversight of all schools funded by Maine's taxpayers—including by ensuring such schools advance the State's core, fundamental interest in only fulfilling its educational obligations through schools that serve all children equally and do not

---

*Anderson v. Town of Durham*, No. CIV.A. CV-02-480, 2003 WL 21386768, at \*1 (Me. Super. May 14, 2003), *aff'd*, 895 A.2d 944 (Me. 2006).

discriminate based on prohibited characteristics such as religion, sexual orientation, gender identity or expression, or disability.

The State carefully designed the MTP to advance these interests, creating a limited program that allows regulated, nonsectarian, nondiscriminatory private schools to be eligible to provide publicly funded education. Invalidating section 2951(2) would force the State to provide and fund public education in private schools established to advance a sectarian mission. Regulating these schools so that they meet the same state standards as the non-sectarian schools currently participating in the program would enmesh the State in regulating matters of religion. What is more, because private religious schools—including those identified by Plaintiffs in this case—frequently discriminate in both student admissions and employment based on religion, sexual orientation, gender identity or expression, or disability, invalidating section 2951(2) as to such schools would force the State to fund discrimination. Maine has wisely determined, through section 2951(2), to avoid this entanglement, thereby preserving both its own interests and the autonomy of religious schools.

## I. Maine Designed the Tuition Program to Advance Its Interest in Ensuring that Its Constitutionally Required System of Schools Is Accountable, Inclusive and Free from Discrimination

Maine established the MTP in furtherance of its duty under the Maine constitution, and its paramount interest in providing public education to its young

7

people. The MTP is a carefully designed program that ensures all Maine students will have access to free, high-quality schools—even when their communities are too small to establish traditional public schools. And the non-sectarian nature of the MTP ensures that participating schools conform to state standards and are open to all students. As this Court has already recognized, the State has legitimate motivations for funding only non-sectarian schools, including to "avoid[] entanglement, and allay[] concerns about accountability that undoubtedly would accompany state oversight of parochial schools' curricula and policies." *Eulitt*, 386 F.3d at 356. Thus, the program as constructed furthers Maine's interests in a free, accountable, and inclusive education to all its young people.

1. Providing a free and inclusive education is "perhaps the most important function of state and local governments." *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 493 (1954); *see also Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) (noting that education is of "supreme importance"). Public "education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler v. Doe*, 457 U.S. 202, 221 (1982). The Maine Constitution recognizes the importance of public education by granting it a constitutional status not afforded to any other public service apart from the state militia. In particular, it imposes on the Legislature a "duty to require, the several

towns to make suitable provision, at their own expense, *for the support and maintenance of public schools*." Me. Const. art. VIII, Pt. 1, § 1 (emphasis added).

The Maine Constitution also recognizes that democracy itself depends on free and inclusive public education, noting that education is "essential to the preservation of the rights and liberties of the people." Me. Const. art. VIII, Pt. 1, § 1. Indeed, public schools are "a most vital civic institution for the preservation of a democratic system of government." *Abington School District v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring); *see also Ambach v. Norwick*, 441 U.S. 68, 77 (1979) (finding that "perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists").

2. Maine recognizes that to fulfill its duty to educate its young people, it must ensure that the schools that it funds are accountable to the public and open to all students. The MTP has been carefully designed to do just that.

In most Maine towns, the State fulfills its constitutional mandate to provide for the education of Maine children via traditional public schools, operated by school administrative units.[3] Where SAUs are not able to maintain schools at every

---

[3] Publicly funded private school students currently make up less than 3% of Maine's public school enrollment: 5,091 of 182,496 students statewide. *Compare* Me. Dep't of Educ., *Student Enrollment Data, Private School Data October 1 Counts* 2017/18 (see tab 3, "AttendCts by SchFiscalType"), *with* Me. Dep't of

grade level, they use the MTP, which allows them to provide publicly funded education to their resident children in qualifying schools outside their home district using funds allotted under the State's public school finance formula. In most cases, students in the MTP attend other public schools or private non-sectarian schools that operate under an exclusive contract with the sending SAU. *Id.*§§ 5203(3) (elementary), 5204(3) (secondary); *see also id.* § 2701. SAUs, however, are also authorized to fund other public education at a public or private school selected by the parent, provided the private schools meet certain conditions and are approved by the State. *Id.* §§ 5203(4) (elementary); § 5204(4) (secondary).[4]

The requirements established by the State for a private school to participate in the MTP include baseline standards of education quality, transparency, and accountability, as well as nondiscrimination. Private schools "may be approved for the receipt of public funds for tuition purposes only if" they meet certain accreditation and other requirements. *Id*. at § 2951. In addition to being nonsectarian, *id.* § 2951(2), the schools must "meet[] the requirements for basic school approval" under subchapter I of the statute, *id.* § 2951(1); be incorporated under state and federal law, *id.* § 2591(3); comply with statutory reporting and

<hr>

Educ., *Student Enrollment Data, Public School Data October 1 Counts* 2018/19 (see tab 2, "Attending Counts by SAU"), https://bit.ly/2CsDxpl.
[4] For a current list of "private school[s] approved for attendance purposes," *see* Me. Dep't. of Educ., *Private School Approval*, https://bit.ly/2Crl3p4.

auditing requirements, *id.* § 2951(5); and release records for students transferring to another school unit, *id.* § 2951(7). All private schools whose enrollment is comprised of 60 percent or more publicly funded students must administer state assessments and meet applicable requirements of the state system of learning results. *Id.* § 2951(6). To participate in the program, MTP schools must also work with the district to ensure that publicly funded students take assessments required by the federal Every Student Succeeds Act.[5]

Private schools participating in the MTP must satisfy one of two accreditation pathways: either secure accreditation from the New England Association of Schools and Colleges or from the Maine Department of Education after meeting the extensive requirements specified in Me. Rev. Stat. tit. 20-A, § 2902. *Id*. § 2901(2). Schools using the first pathway must "make available to the commissioner on a timely basis all accreditation reports on the school and shall notify the commissioner promptly upon a determination that the school is not accredited or is on probation." *Id.* § 2906.[6] For schools using the second pathway, section 2902 imposes requirements that closely resemble what is required of public

---

[5] Me. Dep't. of Educ., *Private School Approval, Annual School Approval Report* at 3, https://bit.ly/2Crl3p4.
[6] The New England Association of Schools and Colleges' detailed accreditation standards are available on their website: https://www.neasc.org/.

schools in areas such as curriculum and instruction, accountability standards, teacher certification, length of school years and days, and class size. *Id.* § 2902.

Regardless of accreditation method, all participating private schools must abide by "standards for hygiene, health and safety established by applicable law and rule." *Id*. § 2901(1). The Maine Department of Education, by regulation, requires the private schools to certify compliance with health, safety and fire codes; immunization requirements in Me. Rev. Stat. tit. 20-A §§ 6352-6358; as well as other statutes. Approved private schools are subject to reporting and auditing requirements: they must annually "report to the commissioner the information the commissioner may require," *id.* § 2952, and the Maine Commissioner of Education "may adopt rules regarding tuition charges, accounting, audits, contracts and other aspects of schooling privileges arranged between a private school and school administrative units," *id.* § 2954.

3. The MTP not only ensures that all publicly funded schools satisfy these accountability requirements, but it also ensures that such publicly funded schools are open to all. Maine's Human Rights Act ("HRA") applies to "any private school or educational program approved for tuition purposes," Me. Rev. Stat. tit. 5, § 4553(2-A), and seeks to eradicate the underlying causes of discrimination and halt discriminatory practices—in education and elsewhere—that stigmatize and make second-class citizens of certain Mainers, Me. Rev. Stat. tit. 5, § 4552 (expressing

that Maine's public policy "to prevent discrimination in. . . access to public accommodations on account of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin" requires the State to "review all practices infringing on the basic human right to a life with dignity" in order to "protect the public health, safety and welfare."). The HRA specifically proscribes, among other things, discrimination in educational programs "because of sex, sexual orientation, a physical or mental disability, national origin or race," *id.* § 4601, and "gender identity or expression," *id.* § 4553(9-C).[7]

Eliminating discrimination, as Maine seeks to do through the HRA, "plainly serves compelling state interests of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1728 (2018) (noting that a state "can protect gay persons, just as it can protect other classes of individuals"); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (holding that the government's compelling interest in eradicating race discrimination in education overrode burden on religious exercise). And given the State's critical interest in education, eliminating discrimination in education is all the more significant. *Brown*, 347 U.S. at 493

---

[7] "The Act also defines "sexual orientation" to include "a person's actual or perceived . . . gender identity or expression." *Id.* § 4553(9-C); *see Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600 (Me. 2014) (holding that banning a transgender girl from using the girls' bathroom "constituted discrimination based on [her] sexual orientation" under the HRA).

("[W]here the state has undertaken to provide it, [education] is a right which must be made available to all on equal terms."); *see also Hunter ex rel. Brandt v. Regents of Univ. of California*, 190 F.3d 1061, 1067 (9th Cir. 1999) (finding that the state had "a compelling interest in providing effective education to its diverse, multi-ethnic, public school population").

Discrimination not only denies students equal educational opportunities; it denies them basic respect and dignity. And it harms not just the students who face discrimination, but the entire school community. The resulting harms spread through society, as denials to students of equal educational opportunities stunt their ability to contribute to the community at large. Allowing state-funded schools to discriminate against children and their families based on a disability or their religion, sexual orientation, or gender identity or expression, would cause all these harms and would undermine the state's effort to prevent them. And if the State were forced to sanction education discrimination, it would harm all Mainers by sending the message that some members of society are not worthy of equal respect.

As one example, when a school refuses to admit students with disabilities it both denies equal opportunities to disabled students and ensures that students who do attend those schools will be denied the benefits of attending school with disabled students. Such discrimination, particularly if it results in further segregation of disabled students, has long been prohibited. *See, e.g., Olmstead v.*

14

*L.C.*, 527 U.S. 581 (1999). When students with disabilities are educated alongside their non-disabled peers, disabled and non-disabled students score higher on literacy measures, perform better on standardized tests, get better grades, and are more likely to master their individualized education program goals.[8]

Anti-LGBTQ policies are also a deeply harmful form of sex discrimination. LGBTQ students, even in the absence of explicit discriminatory policies, face serious hurdles to their educational success. They too often face discrimination and verbal, physical and even sexual assault. These experiences lead to withdrawal, lower academic achievement, depression, and higher rates of suicide.[9]

On the other hand, in schools that protect LGBTQ students from discrimination, students have better relationships with staff and, as a result, feel safer at school.[10] And LGBTQ students have more academic success at such

---

[8] *See* Kathleen Whitbread, *What Does the Research Say About Inclusive Education?*, Wrightslaw (1998-2019), https://goo.gl/K6TzL6; Anne M. Hocutt, *Effectiveness of Special Education: Is Placement the Critical Factor?*, 6 Future pf Children 77, 91 (1996), http://bit.ly/32lPd7z.

[9] *See, e.g.*, Orly Rachmilovitz, *No Queer Child Left Behind*, 51 U.S.F. L. Rev. 203, 204–05 (2016), http://bit.ly/2PUmaVW ("Social science research has shown that LGBT youth who face homophobia or transphobia through discrimination or harassment in schools are at higher risk of drug use, risky sexual behavior, suicidality, and other mental health risks than straight youth" and "also more likely to slip in their academic achievements and less likely to graduate high school or go to college." (citations omitted)).

[10] Nat'l Ass'n of Sch. Psychologists & Gender Spectrum, *Gender Inclusive Schools: Policy, Law, and Practice* at 2 (2016), http://bit.ly/2Nl0TDh (citing Jenifer K. McGuire, *et al.*, *School Climate for Transgender Youth: A Mixed*

schools.[11] The Centers for Disease Control explains that "[f]or youth to thrive in their schools and communities, they need to feel socially, emotionally, and physically safe and supported."[12] Several federal circuits have recognized the vital importance of inclusive education. For example, the Seventh Circuit has noted that "all students' needs are best served when students are treated equally." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1055 (7th Cir. 2017). And the Third Circuit has found that LGBTQ protections in schools

> foster[] an environment of inclusivity, acceptance, and tolerance. . . . [T]hese values serve an important educational function for both transgender and cisgender students. When a school promotes diversity and inclusion, classroom discussion is livelier, more spirited, and simply more enlightening and interesting because the students have the greatest possible variety of backgrounds. Students in diverse learning environments have higher academic achievement leading to better outcomes for all students. Public education must prepare pupils for citizenship in the Republic, and inclusive classrooms reduce prejudices and promote diverse relationships which later benefit students in the workplace and in their communities. Accordingly, the School District's policy. . . benefits all students by promoting acceptance.

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018) (cleaned up).

---

*Method Investigation of Student Experiences and School Responses*, 39 J. Youth & Adolescence 1175 (2010)).

[11] Stephen T. Russell, *et al.*, *Safe Schools Policy for LGBTQ Students*, 24 Social Policy Report, no. 4, at 6–7 (2010), http://bit.ly/33loLMI.

[12] Centers for Disease Control and Prevention, *Lesbian, Gay, Bisexual, and Transgender Health*, http://bit.ly/2JUe2AU.

By contrast, state-sanctioned discrimination against LGBTQ students would harm all Mainers, and particularly stigmatize LGBTQ Mainers and their families. As the Supreme Court has recognized, depriving educational opportunity to any subset of students necessarily harms broader society: "significant social costs [are] borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Plyler*, 457 U.S. at 221. And research shows that LGBTQ Americans experience a "fundamental social cause" of harm when they are among other things, denied admission, or when the state authorizes discrimination against them.[13]

The stigma-related stress experienced by LGBTQ people has been linked to a disproportionately high prevalence of psychological distress, depression, anxiety, substance-use disorders, and suicidal ideation and attempts—many of which are two to three times greater among LGBTQ populations. *See generally*, Brief of Amici Curiae American Public Health Association and Whitman-Walker Health in Support of Petitioners, *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) (citing significant research showing that "[s]tigma is associated with a marked gap in health outcomes between LGB and heterosexual individuals. Study after study

---

[13] *See* Mark L. Hatzenbuehler, *et al.*, *Stigma as a Fundamental Cause of Population Health Inequalities*, 103:5 Am. J. Pub. Health 813, 813 (2013), http://bit.ly/2NZ1s4X.

confirms that LGB individuals suffer from higher rates of depression, physical illness, and disability compared to heterosexuals").

Altogether, Maine has developed an extensive and carefully constructed statutory and regulatory framework to ensure that nonsectarian private schools participating in the MTP provide students with an education that is consistent with the State's public education standards and requirements, and in a school environment free from discrimination.

## II. Forcing Maine to Fund Sectarian Schools Would Undermine Its Interest in Ensuring Its Schools are Accountable, Inclusive and Free from Discrimination

Should the Plaintiffs prevail, Maine will not only be unable to effectively advance its bedrock interest in an accountable, inclusive public education system, but it will also be required to undermine its interest in promoting free, accountable, and inclusive public education by funding sectarian schools that are unable or unwilling to comply with the oversight and anti-discriminatory provisions of Maine law. Even if they were willing and able, given the constitutional constraints that the Religion Clauses of the U.S. Constitution place on governmental regulation of religious entities, Maine would, at the very least, face legal challenge about whether and how it could regulate these schools—including by ensuring nondiscrimination—because the State would be confronted with assertions that such regulation interferes with the schools' rights under the Religion Clauses.

18

1. School voucher programs in other states amply illustrate why Maine cannot both fund sectarian schools and advance its interests in an accountable and inclusive education system. These other voucher programs look very much like the system Plaintiffs and their *amici* would like to see in Maine: they fund religious education while attaching few accountability strings to those funds, in part to avoid concerns about religious entanglement that may arise from state regulation of religious schools. In all but a handful of states, these programs impose only bare-bones requirements concerning academic programs, student assessments, and teacher qualifications.[14] And they allow schools to freely discriminate against students and staff based on religion, sex, disability, past academic performance, sexual orientation, and gender identity or expression.[15] As a result, such programs have been uniformly harmful to the goal of promoting an accountable, inclusive school system. And because they have no meaningful mechanism for ensuring

---

[14] *See* Nat'l Coal. for Pub. Educ., *Vouchers Lack Accountability and Fund Poor Quality Schools*, http://bit.ly/2JdBdGm.

[15] *See, e.g*., Suzanne E. Eckes, Julie Mead & Jessica Ulm, *Dollars to Discriminate: The (Un)intended Consequences of School Vouchers*, Peabody J. of Educ., 91:4 537-558 (Aug. 2016), http://bit.ly/2odFulO; Rebecca Klein, *These Schools Get Millions Of Tax Dollars To Discriminate Against LGBTQ Students,* Huffington Post (Dec. 17, 2017), http://bit.ly/31DfttI (finding that at least 14 percent of voucher schools nationwide "take an active stance against LGBTQ staff and students").

quality of participating schools, they frequently have negative impacts on student achievement as well.[16]

Indeed, in one of the only circumstances where a state with a voucher program has attempted to regulate religious schools, it is facing a court challenge. In *Bethel Ministries v. Salmon* a church has sued the State of Maryland, alleging that the state violated its constitutional rights by expelling a school it operates from a school voucher program because of the school's anti-LGBTQ policies—which violated the program's explicit anti-discrimination requirements for participating schools. No. 19-cv-01853 (filed D. Md. June 24, 2019).

If the Plaintiffs prevail, caselaw addressing government regulation of religious entities may fail to provide Maine with easy answers to similar dilemmas. To be sure, where public funding is concerned courts have squarely rejected the

---

[16] *See, e.g.*, Jonathan N. Mills & Patrick J. Wolf, *The Effects of the Louisiana Scholarship Program on Student Achievement After Four Years*, Univ. of Arkansas EDRE Working Paper 2019-10 (April 23, 2019) (finding that the program caused "large negative effects" on student achievement), http://bit.ly/2PaL4Ac; Megan Austin, R. Joseph Waddington, & Mark Berends, *Voucher Pathways and Student Achievement in Indiana's Choice Scholarship Programs,* RSF: Russell Sage Foundation Journal of the Social Sciences 5(3): 20-40 (May 2019), http://bit.ly/2WNTYp6 (finding "significant achievement losses for students who switch from a public school to a private school with a voucher"); David Figlio & Krzysztof Karbownik, *Evaluation of Ohio's EdChoice Scholarship Program: Selection, Competition, and Performance Effects*, Thomas B. Fordham Institute (July 2016), http://bit.ly/2MEOQ3j (finding that found that participation in the program had an "unambiguously negative" impact on "both reading and math" achievement).

idea that "if a governmental entity offers a benefit. . . under limited qualifying conditions, and a claimant's religious beliefs or practices prevent him or her from meeting those conditions, the benefit must be awarded to the claimant despite the failure to meet the conditions." *Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 701 (10th Cir. 1998). That reasoning holds particular force here, where the government is not offering a benefit to private entities generally, but merely using private entities as a means to facilitate public education that meets certain qualitative standards. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995) ("When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.").

But courts have granted exemptions to religious organizations in other contexts in order to avoid entanglement issues. In *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979), the Supreme Court curtailed the National Labor Relations Board's ability to exercise jurisdiction over teachers in religious elementary and secondary schools, because it presented "a significant risk that the First Amendment will be infringed." In *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012), the Court held that the Constitution's Religion Clauses prevent a sectarian teacher from asserting rights

21

under federal anti-discrimination laws. And in *Surinach v. Pesquera De Busquets*, 604 F.2d 73, 74 (1st Cir. 1979), this Court held that subpoenaing parochial school financial records under a consumer protection law "constituted an impermissible entanglement of the affairs of church and state."[17]

2. More specifically, should the Plaintiffs obtain the result they seek, Maine's antidiscrimination law, which prohibits among other things discrimination in education based on sexual orientation, gender identity or expression, and disability, would be thwarted, and Maine's efforts to eradicate discrimination in public education would be undermined, harming students and underrepresented communities in the process.

Calvary Christian Academy, for example, has a strict policy requiring all students to attend services at the school's affiliated church or at another church "of like faith and doctrine."[18] And at Temple Academy, only Christian families are permitted to enroll children given its requirement that "at least one parent must be born-again and in regular attendance at a Bible-believing church."[19] Temple's

---

[17] *See also People v. DeJonge*, 501 N.W.2d 127 (Mich. 1993) (holding that teacher certification requirement for home schooling violated the Free Exercise Clause); *State ex rel. Nagle v. Olin*, 415 N.E.2d 279, 286 (Ohio 1980) (striking down minimum standards as applied to an Amish family).
[18] Calvary Christian Academy, *School Handbook 2018-2019* 2, 4, https://bit.ly/2W9C5ji.
[19] *Id*.

handbook also states that it will not accept any child with "substantial learning problems or disabilities. All students MUST be able to function in a normal classroom setting."[20]

Likewise, the Bangor Christian School teaches its students that "the term 'marriage' has only one, legitimate meaning, and that is marriage sanctioned by God, which joins one man and one woman in a single, covenantal union," and that "any other type of sexual activity. . . including those that are becoming more accepted in the culture and the courts, are sinful perversions."[21] It also teaches that "[p]resenting oneself as a gender other than the one included on his or her birth certificate" may be grounds for "immediate suspension and probable expulsion."[22] At Temple Academy, the antidiscrimination policy covers race and national origin—but does not prohibit discrimination on the basis of sexual orientation, gender identity or expression, disability, or religion.[23] Such policies are not unusual: private religious schools typically discriminate in admissions and employment on a variety of bases, including disability, religion, sexual orientation, and gender identity or expression.

---

[20]Temple Academy, *Parent/Student Handbook 2018-2019* at 9 https://bit.ly/2H8JziO (emphasis in original).
[21] Bangor Christian Schools, *Student Handbook* at 4 (Jul. 30, 2019), http://bit.ly/2NqGnRP.
[22] *Id*. at 21.
[23] Temple Academy, *supra* note 20 at 9.

Not only do the Plaintiffs want Maine to fund schools that engage in explicit discrimination and argue that the Constitution demands such funding, they also argue that it would be unconstitutional to require the sectarian schools to comply with Maine's antidiscrimination law. As Plaintiffs' counsel stated to the district court, "religious schools are altogether exempt from the prohibition on considering sexual orientation in employment," despite the fact that the HRA states that only "a religious corporation association or organization *that does not receive public funds* is exempt" from that provision. *Carson v. Makin*, No. 18-327, 2019 WL 2619521, *3 (emphasis in original).

Plaintiffs' *amici* and the schools they wish to attend using MTP funds echo and amplify this point. The schools indicated during the district court proceedings that they would be willing to participate in the MTP, but are unwilling to alter their discriminatory policies in order to do so. *See* State's Response to Plaintiffs' Brief in Support of Summary Judgment, Doc. 45 at 1170. And in its brief before this Court, the American Center for Law and Justice argues that "application of [the Maine Human Rights Act] to religious schools would raise serious federal constitutional questions," because "requirements that condemn[] as 'discrimination' a religious school's adherence to…religious doctrines on sexuality and human nature," amount to "condition[ing] participation in public programs on [] sacrifice of religious identity." Amicus Brief of Am. Ctr. For Law and Justice at

24

5. Thus, they argue the entire HRA, without limitation, does not apply to religious schools in instances where it conflicts with those schools' policies and practices.

As these arguments would have it, the State may be compelled to fund schools that either prevent disabled and LGBTQ students (or students from LGBTQ families) from attending schools or that discriminate against them and harm them once they arrive. To attend, they and their families would be compelled to live closeted school lives tarred by the shame and stigma of such overt discrimination. If Maine funded such schools, it would be signaling to disabled and LGBTQ students and their families that they and their lives are not worthy of society's equal respect; that they are outcasts and pariahs who ought to be feared; and that their classmates must be protected from them.

The "necessary consequence" of such an outcome is to demean and stigmatize LGBTQ students. *C.f., Obergefell*, 135 S. Ct. at 2602. And the "purpose and practical effect" of the discriminatory policies of sectarian schools here would "impose a disadvantage, a separate status, and so a stigma" upon all who are denied enrollment, or expelled, based upon their statuses. *United States v. Windsor,* 570 U.S. 744, 746 (2013). Requiring the State to give such schools public funds while still allowing them to fail to serve all students equally "would undercut the 'equal dignity'" of individuals that governments have the right to protect. *See Obergefell*, 135 S. Ct. at 2608; *see also Windsor*, 570 U.S. 744, 746-47; *Lawrence*

*v. Texas*, 539 U.S. 558, 567, 574-75 (2003). The notion that Maine does not have the authority to enforce anti-discrimination laws with respect to the schools it funds is deeply at odds with one of its most important interests in ensuring an accountable an inclusive system of publicly funded schools. Moreover, if the Plaintiffs and their *amici* dispute that the State's interest in *anti-discrimination* in education—which, as we have detailed above, is a particularly important interest with profound implications for the well-being of children—is insufficient to permit regulation of private religious schools, they will assuredly dispute that it can do so where less weighty state interests are concerned. Of particular relevance to the MTP, they will argue that the State cannot set curriculum standards, impose fiscal accountability requirements, or impose health and safety requirements on schools that take MTP funds. Under this scheme, religious schools would be constitutionally entitled to state funds, but entitled to broad exemptions from state conditions on those funds.

While the reasoning in *Swanson* and *Rosenberger* ought to prevail against such arguments, Maine has wisely decided to avoid grappling with constant objections from sectarian schools that state requirements for MTP participants intrude on their religious freedom. And in fact it has done so in the only way that preserves its interests: by declining to fund religious schools altogether, ensuring

26

that only private schools that the State can clearly regulate may participate in the program.

**CONCLUSION**

The State has a vital interest and unyielding federal and state legal obligation to ensure quality education and prevent discrimination in its public school system, of which the MTP is an integral part. As the record before this Court shows, sectarian schools maintain policies that are plainly discriminatory and clearly impermissible in the public schools. In the performance of its core constitutional duties, the State must not use public funds to support discriminatory policies and practices, both because doing so is prohibited and because these practices are harmful to children and their educational outcomes.

*Amici* urge this Court to affirm the judgment of the district court.

Respectfully submitted,

/s/ Kristen Hollar
Kristen Hollar
National Educational Association
1201 16th Street, NW
Washington, D.C. 20036
(202) 833-4000

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,262 words according to the word count feature of Microsoft Word.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Kristen Hollar
Kristen Hollar

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2019, I electronically filed the foregoing Brief of Education and Civil Rights Organizations, using the CM/ECF system, which distributed a copy to the following:

Emma Bond
Zachary Heiden
ACLU of Maine
121 Middle St, Suite 200
Portland, ME 04101

Samuel Boyd
Southern Poverty Law Center
PO Box 370037
Miami, FL 33137

Thomas E. Chandler
US Dept of Justice
3708, Ben Franklin Station
PO Box 14403
Washington, DC 20044-4403

Elliott M. Davis
US Dept of Justice
Civil Division, Rm 5529
950 Pennsylvania Ave NW
Washington, DC 20530-0001

Joshua D. Dunlap
Pierce Atwood LLP
254 Commercial St
Merrill's Wharf
Portland, ME 04101

Jeffrey Thomas Edwards
Preti Flaherty Beliveau & Pachios
1 City Center, PO Box 9546
Portland, ME 04112-9546

Sarah A. Forster
Christopher C. Taub
Maine Attorney General's Office
6 State House Station
Augusta, ME 04333-0006

Sarah Goetz
Americans United for Separation of Church and State
1310 L St NW, Ste 200
Washington, DC 20005

Leslie Davs Hiner
EdChoice
111 Monument Cir, Ste 2650
Indianapolis, IN 46204

Richard Katskee
Alexander Luchenitser
Americans United for Separation of Church and State
1310 L St NW, Ste 200
Washington, DC 20005

Timothy Keller
Institute for Justice
398 S Mill Ave, Ste 301
Tempe, AZ 85281

Julia M. Lipez
US Attorney's Office
100 Middle St, 6th Flr
Portland, ME 04101-4100

Andrew T. Mason
Maine Education Association
35 Community Dr
Augusta, ME 04330

Russell Menyhart
Taft Stettinius & Hollister
1 Indiana Sq, Ste 3500
Indianapolis, IN 46204

Francisco M. Negron, Jr.
National School Boards Association
1680 Duke St., FL2
Alexandria, VA 22314

Arif Panju
Institute for Justice
816 Congress Ave, Ste 960
Austin, TX 78701

Lea Patterson
First Liberty Institute
2001 W Plano Pkwy, Ste 1600
Plano, TX 75075

Jay Sekulow
American Center for Law and Justice
201 Maryland Ave., NE
Washington, DC 20002-5703

Bruce W. Smith
Malina E. Dumas
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, Maine 04101

Heather L. Weaver
Daniel Mach
American Civil Liberties Union
915 15th Street NW, 6th Floor
Washington, DC 20005

Jonathan R. Whitehead
Michael K. Whitehead
Whitehead Law Firm LLC
229 SE Douglas, Ste 210
Lees Summit, MO 64063

Stephen C. Whiting
Whiting Law Firm
75 Pearl St, Ste 207
Portland, ME 04101

/s/ Kristen Hollar
Kristen Hollar