No. 19-1746

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

DAVID CARSON, as parent and next friend of O.C.;
AMY CARSON, as parent and next friend of O.C.;
ALAN GILLIS, as parent and next friend of I.G.;
JUDITH GILLIS, as parent and next friend of I.G.;
TROY NELSON, as parent and next friend of A.N. and R.N.;
ANGELA NELSON, as parent and next friend of A.N. and R.N.,

Plaintiffs - Appellants

v.

A. PENDER MAKIN, in her official capacity as Commissioner of the
Maine Department of Education,

Defendant - Appellee

_____

On Appeal from the United States District Court for the District of Maine

**BRIEF OF DEFENDANT-APPELLEE A. PENDER MAKIN**

AARON M. FREY
Attorney General

Of Counsel:

SUSAN P. HERMAN
Deputy Attorney General

SARAH A. FORSTER
CHRISTOPHER C. TAUB
Assistant Attorneys General
Six State House Station
Augusta, ME  04333-0006
(207) 626-8800
*Attorneys for Defendant-Appellee*
*A. PENDER MAKIN*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF THE ISSUES.................................................................1

INTRODUCTION ....................................................................................1

STATEMENT OF THE CASE...................................................................3

    I.    Maine's Public Education System...........................................4

    II.   The Attorney General's Opinion, the Legislature, and two prior legal challenges ....................................................................5

    III.  The Appellants.......................................................................7

    IV.  Bangor Christian Schools (BCS)...........................................9

    V.   Temple Academy (TA).........................................................12

SUMMARY OF THE ARGUMENT ......................................................15

ARGUMENT .........................................................................................17

    I.    Appellants lack standing because a favorable ruling would not redress their alleged injury since it is no more than "merely speculative" whether any private sectarian school would accept public tuition funds.................................................................17

          A.   This Court is not bound by *Eulitt*, because *Eulitt* did not consider or decide the issue of redressability ................................................20

          B.   Appellants have failed to present evidence that it is "likely," as opposed to "merely speculative," that a sectarian school will agree to accept public funds ........................................................ 21

    II.   This Court is bound by the First Circuit's decision in *Eulitt* with respect to the free exercise, equal protection and free speech claims......24

III.    Maine's decision to maintain a secular public education system
does not violate the Free Exercise Clause ................................................. 29

    A.    Unlike Trinity Lutheran Church, Appellants and their chosen
schools are not "otherwise fully qualified" for a "generally
available public benefit" ................................................................. 31

    B.    Unlike Trinity Lutheran Church, Appellants are not being
denied participation in the tuition program because of who
they are, but because of what they seek to do with the
public funds ...................................................................................... 36

    C.    The tuition program does not reflect hostility or animus
toward religion .................................................................................. 39

IV.    Maine's tuition program does not violate the Equal Protection
Clause ........................................................................................................... 41

V.    Appellants' remaining claims are without merit ..................................... 43

CONCLUSION ................................................................................................. 47

BRIEF FORMAT CERTIFICATION ................................................................. 48

CERTIFICATE OF SERVICE ........................................................................... 49

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) ............................................................... 17, 19

*American Legion v. American Humanist Association*,
   139 S. Ct. 2067 (2019) ........................................................................44

*Anderson v. Town of Durham*, 895 A.2d 944, 2006 ME 39 ....................................7

*Bagley v. Raymond Sch. Dep't*, 728 A.2d 127, 1999 ME 60................................6, 7

*Boston Five Cents Sav. Bank v. Sec'y of the Dep't of Housing and Urban Dev.*,
   768 F.2d 5 (1st Cir. 1985) .....................................................................21

*Brown v. Board of Educ.*, 347 U.S. 483 (1954)........................................................1

*Christian Science Reading Room Jointly Maintained*,
   784 F.2d 1010 (9th Cir. 1986).................................................................43

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017)......................................24

*Desert Water Agency v. U.S. Dep't of the Interior*,
   849 F.3d 1250 (9th Cir. 2017)................................................................18

*Espinoza v. Montana Dep't of Revenue*, 453 P.3d 603 (Mont. 2018)..................... 5

*Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (2004) .................................... *passim*

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ...........................................40

*Freedom From Religion Found. v. Morris Cty. Bd. of Chosen Freeholders*,
   181 A.3d 992 (N.J. 2018) ......................................................................26

*Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198 (1st Cir. 2002) ..............40

*Hallissey v. Sch. Admin. Dist. No. 77*, 755 A.2d 1068, 2000 ME 143 ............. 32, 41

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) .....................................................20

*Locke v. Davey*, 540 U.S. 712 (2004) ......................................................... *passim*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................... 17, 18, 21, 24

*Maher v. Roe*, 432 U.S. 464 (1977) ........................................................46

*Marks v. United States*, 430 U.S. 188 (1977) ........................................25

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n.*,
    138 S. Ct. 1719 (2018) ......................................................................41

*Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004) ..........................................................20

*Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993) ................................................23

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
    489 F.3d 1267 (D.C. Cir. 2007) ........................................................18

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ..............33

*San Juan Cable LLC v. Puerto Rico Tel. Co.*, 612 F.3d 25 (1st Cir. 2010) ............24

*Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) ..............18

*Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999) ............................. 6, 7, 44

*Tilton v. Richardson*, 403 U.S. 672 (1971) ............................................34

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) ................................................................ *passim*

*Walz v. Tax Comm'r of City of New York*, 397 U.S. 664 (1970) ..............34

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................19

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ....................................40

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........33

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ..............................................33

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) ........................ *passim*

## Constitutions

Me. Const. art. VIII, pt. 1, § 1.................................................................. 4

**Statutes**

5 M.R.S. § 4553(10)(G) .................................................................23

5 M.R.S. § 4572(1)(A) ................................................................. 23

20-A M.R.S. § 2(1) ...................................................................4, 31

20-A M.R.S. § 1001(8) ..............................................................4, 31

20-A M.R.S. § 2401(9) ................................................................33

20-A M.R.S. § 2402 .....................................................................33

20-A M.R.S. § 2404(2) ................................................................33

20-A M.R.S. § 2701 ......................................................................4

20-A M.R.S. § 2702 ......................................................................4

20-A M.R.S. § 2951 ......................................................................5

20-A M.R.S. § 2951(2) ........................................................... *passim*

20-A M.R.S. § 5204(4) ......................................................... 5, 31, 32

20-A M.R.S. § 8201 .....................................................................33

20-A M.R.S. § 8205(11) ..............................................................33

20-A M.R.S. § 8231 ..................................................................... 33

20-A M.R.S. § 8235(11) .............................................................. 33

## STATEMENT OF THE ISSUES

1. Do Appellants lack standing to bring their claims because they cannot demonstrate that it is more than mere speculation that the injury they allege would be redressed by a favorable ruling?

2. Is this Court bound by its prior decision in *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004) that Maine's tuition program does not violate the Free Exercise, Equal Protection, or Free Speech Clauses?

3. Does Maine's tuition program, which uses secular, but not sectarian, private schools in limited circumstances in order to ensure a public education is available to all students violate the Free Exercise, Equal Protection, Free Speech, or Establishment Clauses?

## INTRODUCTION

Sixty-five years ago, the United States Supreme Court declared that "education is perhaps the most important function of state and local governments." *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954). This case represents the third time in the past 20 years that a handful of Maine parents who wish to receive public funding for the pervasively sectarian education they have chosen (or wish to choose) for their children seek to transform Maine's public education system by requiring the State to include sectarian schools in a program designed to provide a free public education to students whose local school administrative unit neither

1

operates a secondary school nor contracts for secondary schooling privileges.  In the first challenge, both Maine's Law Court and this Court held that the Establishment Clause prevented Maine from allowing payments to sectarian schools.  A few years later, both Maine's Law Court and this Court held that while the intervening Supreme Court decision in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), created the possibility that Maine *could* design a program that would allow parents to direct public dollars to sectarian schools without violating the Establishment Clause, a second intervening Supreme Court case, *Locke v. Davey*, 540 U.S. 712 (2004), made clear that nothing in the Constitution *requires* Maine to do so.

The current challenge is based solely on the Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), which held that a government program that categorically disqualified an otherwise fully qualified applicant from consideration for a generally available public benefit merely because it was a religious institution violated the Free Exercise Clause. But before Appellants can reach *Trinity Lutheran*, they face two roadblocks.  First, they lack standing to bring their claims because they cannot demonstrate that it is likely, as opposed to merely speculative, that the injury they allege would be redressed by a favorable ruling:  they fail to present any evidence that a single sectarian school to which they would send their children is likely to accept public

tuition funds.  Second, this Court is bound by the precedent established by its prior ruling in *Eulitt v. Maine Dep't of Educ*., 386 F.3d 344 (1st Cir. 2004), that Maine's tuition program does not violate the Free Exercise Clause, the Equal Protection Clause, or the Free Speech Clauses of the Constitution.  The narrow holding of *Trinity Lutheran*, which is limited to a single set of facts and specifically excludes "religious uses of funding," does not call into question this Court's *Eulitt* decision.

Even if this Court were to reach the merits, nothing in *Trinity Lutheran* points to the conclusion that because Maine operates a secular public education system, it is compelled by the Free Exercise Clause, or any other provision of the Constitution, to fund schools that represent a quintessentially religious endeavor: delivering instruction directly aimed at recruiting and inculcating students in a particular faith to the exclusion of all others.  Maine's exclusion of sectarian schools from its system of public education is fully constitutional and should again be upheld.

## **STATEMENT OF THE CASE**

This matter was submitted to the District Court on a stipulated record.[1]

The Constitution of Maine states:

---

[1] The statements of fact in this section are contained in the Joint Stipulated Facts, reproduced in the Joint Appendix at pages 60-90 and cited throughout as "JSF, ¶ __."

> A general diffusion of the advantages of education being essential to the preservation of the rights and liberties of the people; to promote this important object, the Legislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools; . . .

Me. Const. art. VIII, pt. 1, § 1.  The Constitution of Maine has never had a so-called "Blaine amendment" or "no-aid" clause.  Pursuant to 20-A M.R.S. § 2(1), "[i]t is the intent of the Legislature that every person within the age limitations prescribed by state statues shall be provided an opportunity to receive the benefits of a free public education."  JSF, ¶ 1.

## I.    Maine's Public Education System.

In Maine, there are currently 260 local school administrative units (SAUs), defined by statute as the state-approved unit of school administration, serving nearly 180,000 students in grades K-12 at public expense.  JSF, ¶¶ 3, 4, 20.  Each SAU "shall either operate programs in kindergarten and grades one to 12 or otherwise provide for students to participate in those grades as authorized elsewhere [by statute]."  20-A M.R.S. § 1001(8); JSF, ¶ 5.  Of the 260 SAUs, 143 do not operate a secondary school.  JSF, ¶ 6.  Maine law provides two alternatives for an SAU to provide a public education to its resident students when it does not operate a public school for one or more grades.  First, an SAU may contract with another public or approved private school for schooling privileges for some or all of its resident students in those grades.  20-A M.R.S. §§ 2701, 2702.  Second, an

SAU "that neither maintains a secondary school nor contracts for secondary school privileges pursuant to chapter 115 shall pay the tuition, in accordance with chapter 219, at the public school or the approved private school of the parent's choice at which the student is accepted." 20-A M.R.S. § 5204(4); JSF, ¶ 7.

20-A M.R.S. § 2951 contains the requirements for a private school to be approved to receive public funds for tuition purposes. JSF, ¶ 13. Those schools must, *inter alia*, meet the requirements for basic school approval contained in the statute, agree to comply with reporting and auditing requirements, and, at the center of the current dispute, be "a nonsectarian school in accordance with the First Amendment of the United States Constitution." 20-A M.R.S. § 2951(1), (2), (5); JSF, ¶ 14.[2]

## II.    The Attorney General's Opinion, the Legislature, and two prior legal challenges.

Prior to 1980, some sectarian schools received public funds for tuition purposes. JSF, ¶ 18. In January of 1980, in response to a request from a legislator, the Attorney General issued an opinion that thoroughly reviewed the existing First Amendment jurisprudence and concluded that the public funding of religious

---

[2] Because this dispute involves a statutory prohibition unique to the tuition program, and not a "Blaine amendment" or other universal "no-aid" provision, the Supreme Court's decision in *Espinoza v. Montana Dep't of Revenue*, 453 P.3d 603 (Mont. 2018), *cert. granted,* 139 S. Ct. 2777 (2019), is unlikely to resolve this matter.

schools would violate the Establishment Clause.  JSF, ¶ 187; Joint App. at 42.

Subsequently, the Legislature enacted the provision currently codified at Section

2951(2).  JSF, ¶ 188.  More than 15 years later, two separate groups of parents

filed lawsuits challenging the constitutionality of Section 2951(2).  Both the Maine

Law Court and this Court agreed with the reasoning of the Attorney General and

held that the Establishment Clause prevented Maine from allowing payments to

sectarian schools.  *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127, 1999 ME 60;

*Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999).

That was not the end of the Legislature's consideration of the use of public

tuition dollars for sectarian education.  In 2002, the Supreme Court decided

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002).  *Zelman* held, for the first time,

that it was possible for a state to develop a so-called "voucher" program that would

allow parents to use public money to pay for sectarian schools without violating

the Establishment Clause.  536 U.S. at 662-63.  Presented with the opportunity to

consider public tuition payments for sectarian education anew, a bill was

introduced in 2003 to repeal Section § 2951(2).  JSF, ¶ 189.  As will be discussed

below, several legislators articulated the important rationales for continuing the

exclusion of sectarian schools from the public tuition program.  JSF, ¶¶ 191-196;

199-201.  The bill was rejected and did not become law.  JSF, ¶ 202.

At around the same time, two sets of parents again challenged the constitutionality of Section 2951(2), contending that since the State's defense in *Bagley* and *Strout* focused on its concern about violating the Establishment Clause and that concern had been addressed by *Zelman*, there was now no justification for the continued exclusion of sectarian schools.  Again the parents were unsuccessful: both Maine's Law Court and this Court held that while *Zelman* created the possibility that Maine could design a program that would allow parents to direct public dollars to sectarian schools without violating the Establishment Clause, a second intervening Supreme Court case, *Locke v. Davey*, 540 U.S. 712 (2004), made clear that nothing in the Constitution required Maine to do so.  *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004), *Anderson v. Town of Durham*, 895 A.2d 944, 2006 ME 39.

## III.    The Appellants.

David and Amy Carson are a married couple residing in Glenburn, Maine. JSF, ¶ 26.  Glenburn neither operates a secondary school nor contracts for secondary school privileges.  JSF, ¶¶ 6, 9.  The Carsons' daughter, O.C., is a high-school sophomore at Bangor Christian Schools ("BCS").  ¶ 27.  The Carsons send O.C. to BCS because the school's Christian worldview aligns with their sincerely held religious beliefs and because of the school's high academic standards.  JSF,

¶ 29.  The Carsons see as a benefit that BCS teaches Christian values and believe that BCS is helping O.C. become a better Christian.  JSF, ¶¶ 39-40.  The Carsons' religion neither requires them to send their daughter to a Christian school nor prevents them from sending her to a public school.  JSF, ¶ 36.

Alan and Judith Gillis are a married couple residing in Orrington, Maine. JSF, ¶ 42.  Orrington neither operates a public secondary school nor contracts for secondary school privileges.  JSF, ¶¶ 6, 9.  The Gillises' youngest daughter, I.G., is a high-school junior at BCS.  JSF, ¶ 43.  I.G. did not begin attending BCS until the 4th quarter of her freshman year; prior to that time, she attended public schools. JSF, ¶¶ 48-49.  The Gillises' three other children all attended public high schools. JSF, ¶ 51.  The Gillises send I.G. to BCS because the school's Christian worldview aligns with their sincerely held religious beliefs and because of the school's high academic standards.  JSF, ¶ 44.  The Gillises believe that BCS provides instruction on how to live one's life as a Christian, and in their opinion that is an underlying part of the school.  JSF, ¶ 53.  Nothing in the Gillises' religion requires them to send their children to a religious school.  JSF, ¶ 52.

Troy and Angela Nelson are a married couple residing in Palermo, Maine. JSF, ¶ 58.  Palermo neither operates a public secondary school nor contracts for secondary school privileges.  JSF, ¶¶ 6, 9.  The Nelsons' daughter, A.N., is currently a high-school sophomore at Erskine Academy.  JSF, ¶ 60.  The Nelsons

do not dispute the quality of secular education their daughter receives at Erskine. JSF, ¶ 61. The Nelsons send their seventh-grade son, R.N., to Temple Academy ("TA") because they believe it offers him a great education that aligns with their sincerely held religious beliefs. JSF, ¶ 62. The Nelsons would like to send their daughter, A.N., to TA, because of the quality of education and the discipline, but cannot afford the cost of tuition for both of their children. JSF, ¶ 65.

## IV.    Bangor Christian Schools (BCS).

BCS is a pervasively sectarian school. It was founded in 1970 as a ministry of the Bangor Baptist Church (now Crosspoint Church), and "is now into its fifth decade of training young men and women to serve the Lord." JSF, ¶¶ 69-70. The Head of School's employment agreement is with Crosspoint Church and he also serves as the Connections Pastor for the church. JSF, ¶¶ 80-81. He reports to Crosspoint's Senior Pastor and Deacon Board. JSF, ¶ 76. Only men are eligible to serve on the Deacon Board. JSF, ¶ 78. BCS believes that God has ordained distinct and separate spiritual functions for men and women, and the husband is to be the leader of the home and men are to be the leaders of the church. JSF, ¶ 79. BCS teaches children that the husband is the leader of the household. JSF, ¶ 102.

Prior to admitting any student, BCS officials meet with the student and his or her family to explain BCS's mission and goal of instilling a Biblical worldview in BCS' students to try to determine if the school is a good fit for the student.

JSF, ¶ 86.  BCS believes that a student who is homosexual or identifies as a gender other than on his or her original birth certificate would not be able to sign the agreement governing codes of conduct that BCS requires as a condition of admission.  JSF, ¶ 89.

At BCS, presenting oneself as a gender other than what is listed on one's original birth certificate, whether done on or off school grounds, "may lead to immediate suspension and probable expulsion."  JSF, ¶ 90.  If a student presented himself or herself as a gender other than that on his or her original birth certificate and refused to stop presenting himself or herself as a different gender after conversations and counseling with school staff, the student would not be allowed to continue attending BCS – just as a student who insisted on drinking every weekend would not be allowed to continue attending the school.  JSF, ¶ 91.  If a student was openly gay and regularly communicated that fact to his or her classmates, "that would fall under an immoral activity" under BCS' Statement of Faith and if "there was no change in the student's position" after counseling, the student would not be allowed to continue attending BCS.  JSF, ¶ 92.  An openly gay student who regularly communicated that fact in the school environment to his or her classmates would receive counseling, but if the student was "entrenched in this is who I am, I think it is right and good" the student would not be allowed to

continue attending BCS because "it clearly goes against [BCS'] Biblical beliefs" – even if the student was celibate and did not engage in homosexual acts.  JSF, ¶ 93.

Among BCS's educational objectives are to 1) "lead each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life;" 2) "develop within each student a Christian world view and Christian philosophy of life;" and 3) "prepare each student for the important position in life of spiritual leadership in school, home, church, community, state, nation, and the world."  JSF, ¶ 96.  Students at BCS are placed on academic probation if they receive an F in any course, unless the course is Bible, in which case a grade below 75% results in probation.  JSF, ¶ 97.  Bible is singled out because "that is the primary thing in our school."  JSF, ¶ 98.

BCS believes that the main reason parents send their children to BCS is to develop a biblical worldview.  JSF, ¶ 99.  BCS does not believe there is any way to separate the religious instruction from the academic instruction – religious instruction is "completely intertwined and there is no way for a student to succeed if he or she is resistant to the sectarian instruction."  JSF, ¶ 101.  For example, one of the objectives in the fifth-grade social studies class is to "[r]ecognize God as creator of the world."  JSF, ¶ 114.  One of the objectives in the ninth-grade social studies class is to "[r]efute the teachings of the Islamic religion with the truth of God's Word."  JSF, ¶ 116.  Attending chapel is mandatory.  JSF, ¶ 103.

To be a teacher at BCS, one must affirm that "he/she is a 'Born Again' Christian who knows the Lord Jesus Christ as Savior."  JSF, ¶ 123.  Moreover, *every* employee of BCS "[m]ust be born again" and "[m]ust be an active, tithing member of a Bible believing church."  JSF, ¶ 124.  BCS will not hire teachers who identify as a gender other than on their birth certificates, nor will it hire homosexual teachers.  JSF, ¶¶ 125-26.

## V.    Temple Academy (TA).

TA is a pervasively sectarian school.  It is an "integral ministry" and essentially an "extension" of Centerpoint Community Church.  JSF, ¶ 134.  Its governing body is Centerpoint's Board of Deacons.  JSF, ¶ 135.  The superintendent of TA is Centerpoint's lead pastor.  JSF, ¶ 139.  While TA has a school board, it is only advisory and operates entirely under the authority of Centerpoint's Board of Deacons.  JSF, ¶¶ 137-38.  The Board of Deacons has the authority to dictate the curriculum for the school.  JSF, ¶ 140.

Under TA's admission policy, a student would most likely not be accepted if he or she comes from a family that does not believe that the Bible is the word of God.  JSF, ¶ 152.  TA has a "pretty hard lined" written policy that states that only Christians will be admitted as students, though exceptions have been made, and might be made in the future, to admit students of different faiths.  JSF, ¶ 153.  Under TA's written admission policy, "students from homes with serious

differences with the school's biblical basis and/or its doctrines will not be accepted." JSF, ¶ 155. A Muslim family would have serious differences with TA's biblical basis and its doctrines. JSF, ¶ 156. TA will not admit a child who lives in a two-father or a two-mother family. JSF, ¶ 159. TA will not admit a student who is homosexual, though there are students presently enrolled who "struggle" with homosexuality. JSF, ¶ 157. A child who identifies with a gender that is different than what is listed on the child's original birth certificate would not be eligible for admission. JSF, ¶ 158.

As a condition of enrollment, the student's parents must sign a Family Covenant in which they affirm that they are in agreement with TA's views on abortion, the sanctity of marriage, and homosexuality and in which they acknowledge that TA may request that the student withdraw if "the student does not fit into the spirit of the institution regardless of whether or not he/she conforms to the specific rules and regulations." JSF, ¶ 161. Students in grades 7 to 12 must sign a covenant in which the student affirms that he or she "will seek at all times, with the help of the Holy Spirit, to live a godly life in and out of school in order that Jesus Chris will be glorified." JSF, ¶ 162.

TA's educational philosophy "is based on a thoroughly Christian and Biblical world view," and a "world view" "is a set of assumptions that one holds about the basic makeup of his world and forms the basis for all that one does and

thinks." JSF, ¶ 144. TA's "academic growth" objectives include "provid[ing] a sound academic education in which the subject areas are taught from a Christian point of view" and "help[ing] every student develop a truly Christian world view by integrating studies with the truth of Scripture." JSF, ¶ 146.

TA provides a "biblically-integrated education," which means that the Bible is used in every subject that is taught. JSF, ¶ 164. Teachers "are expected to integrate Biblical principles with their teaching in every subject taught at Temple Academy." JSF, ¶ 168. TA promotes to students that they should obey the Bible and to accept Christ as their personal savior. JSF, ¶ 174. Students are required to attend a religious service once a week. JSF, ¶ 163.

A person must be a born-again Christian to be eligible for all staff positions at TA, including custodial positions. JSF, ¶ 179. Affirming that "he/she is a born-again Christian who knows the Lord Jesus Christ as Savior" is a necessary qualification to be a teacher. JSF, ¶ 176. Homosexuals are not eligible for employment as teachers at TA. JSF, ¶ 177. TA's Teacher Employment Agreement states that the Bible says that "God recognize[s] homosexuals and other deviants as perverted" and that "[s]uch deviation from Scriptural standards is grounds for termination." JSF, ¶ 178.

# SUMMARY OF THE ARGUMENT

At the outset, Appellants have failed to demonstrate standing to bring their claims.  Because Section 2951(2) does not regulate the Appellants, but rather the sectarian schools who would retain unfettered discretion to decide whether or not to accept public funds, Appellants bear the burden of producing evidence that it is likely, and not merely speculative, that at least one sectarian school to which the Appellants would send their children would accept public funds in the absence of Section 2951(2).  Appellants have made no such showing.  In contrast, the Commissioner has presented evidence that it is unlikely that the two sectarian schools to which the Appellants wish to send their children would agree to accept public funds as it would result in a significant change in how they operate:  both schools currently refuse to hire employees who are homosexual, and the Maine Human Rights Act prohibits religious organizations that accept public funds from refusing to hire employees based on their sexual orientation.

Next, the Appellants' free exercise, equal protection, and free speech claims have already been heard and decided in the State's favor in *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004).  Nothing in the narrow holding of *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), which was explicitly limited to a program allowing organizations to purchase rubber playground surfaces and did not address religious uses of funding, should cause

this Court to reconsider *Eulitt*.  The Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2004), which forms the basis of the *Eulitt* decision, remains in place. This Court correctly applied *Locke* to the tuition program in *Eulitt* and nothing in *Trinity Lutheran* alters this Court's analysis.

Finally, if this Court does reach *Trinity Lutheran*, nothing in *Trinity Lutheran* suggests that Maine no longer has the authority to develop and implement a secular system of public education that relies, in limited circumstances, on secular private schools in lieu of building public secondary schools, without simultaneously funding private sectarian schools.  First, unlike Trinity Lutheran Church, Appellants are not being prevented from seeking the same public benefit as the non-religious:  a free public education.  Appellants are seeking an entirely different benefit:  a free sectarian education.  Second, unlike Trinity Lutheran Church, Appellants are not being treated differently because they are religious, but because they want to use public funds for a religious purpose that raises traditional antiestablishment concerns.  Third, there is no evidence that the tuition program is hostile toward religion or is the result of religious animus. Rather, the tuition program is the result of the considered judgment of the Maine Legislature that the public education made available to all Maine students should be inclusive, tolerant, diverse and religiously neutral, as opposed to exclusive, intolerant and limited to the teachings of single faith.

## ARGUMENT

I.   **Appellants lack standing because a favorable ruling would not redress their alleged injury since it is no more than "merely speculative" whether any private sectarian school would accept public tuition funds.**

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id*. at 560-61 (citations omitted).

When the plaintiff is itself the subject of the challenged governmental action, there is usually "little question" that the action has caused them injury and that a judgment preventing the action will redress the injury.  *Id*. at 561-62.

> When, however . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.  In that circumstance, causation

17

and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.  The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. . . . Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

*Id*. at 562 (citations omitted) (emphasis in original).  "[T]he Supreme Court has consistently said that a plaintiff . . . lacks standing if, notwithstanding the relief sought, the third parties would retain discretion to continue their harmful behavior or, alternatively, if it is too speculative to conclude that they would modify their behavior in the way the plaintiff desires."  *Desert Water Agency v. U.S. Dep't of the Interior*, 849 F.3d 1250, 1257 (9th Cir. 2017); *see also Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs*., 489 F.3d 1267, 1274 (D.C. Cir. 2007) (referring to "*Lujan* as well as several other Supreme Court decisions holding that standing . . . cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling").

For example, in *Simon v. E. Kentucky Welfare Rights Org*., 426 U.S. 26 (1976), indigents and representative organizations sought to challenge an Internal Revenue Service rule giving favorable tax treatment to a nonprofit hospital that

offered only emergency room services to indigents.  They argued that the IRS rule

was unlawful and that hospitals are not entitled to favorable tax treatment unless

they broadly serve the indigent.  *Id*. at 33.  The "injury" that plaintiffs alleged was

that the tax rule encouraged hospitals to deny services to indigents, and they

argued that striking down the ruling would discourage the denial of services.  *Id*. at

42.  The Court held that this was insufficient to establish standing:

> It is purely speculative whether the denials of service specified in the
> complaint fairly can be traced to petitioners' "encouragement" or
> instead result from decisions made by the hospitals without regard to
> the tax implications.  It is equally speculative whether the desired
> exercise of the court's remedial powers in this suit would result in the
> availability to respondents of such services. So far as the complaint
> sheds light, it is just as plausible that the hospitals to which
> respondents may apply for service would elect to forgo favorable tax
> treatment to avoid the undetermined financial drain of an increase in
> the level of uncompensated services.

*Id*. at 42-43.  Because the plaintiffs' complaint did not allege facts suggesting a

"substantial likelihood" that a favorable judgment would provide them with the

medical care they sought, the Court held that the complaint should be dismissed for

lack of standing.  *Id*. at 44-46; *see also Allen*, 468 U.S. at 737 (plaintiffs lacked

standing where it was "entirely speculative" whether withdrawal of tax exemption

would cause racially discriminatory private schools to change their policies);

*Warth v. Seldin*, 422 U.S. 490 (1975) (plaintiffs did not have standing to challenge

town zoning ordinance that allegedly prevented the construction of affordable

housing because there was no evidence that striking down the ordinance would

cause builders and developers to construct such housing); *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) (mother lacked standing to bring action challenging constitutionality of child support statute because even if mother were granted the requested relief and father was subject to prosecution, it was speculative whether this would result in the father paying child support); *Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930 (D.C. Cir. 2004) (plaintiffs lacked standing to challenge Title IX policy because even if policy is vacated, decision to eliminate or curtail wrestling opportunities remained the independent decisions of the educational institutions).

A. *This Court is not bound by Eulitt, because Eulitt did not consider or decide the issue of redressability.*

Despite knowing from the briefing and argument below that the Commissioner would raise the standing issue on appeal, Appellants' only mention of standing is in the "Procedural History" section of their brief, where they state that the District Court concluded that this Court in *Eulitt* previously determined that "parents" have standing to "challenge" section 2951(2). App. Br. at 7-8. Yet the *Eulitt* decision addressed only the "injury in fact" element of standing, and never considered or decided redressability. *Eulitt*, 386 F.3d at 353 ("the parents' allegation of injury in fact to their interest in securing tuition funding provides a

satisfactory predicate for standing"). There is no mention of causation or redressability anywhere in the *Eulitt* decision.[3]

> B.  *Appellants have failed to present evidence that it is "likely," as opposed to "merely speculative," that a sectarian school will agree to accept public funds.*

The Appellants bear the burden of proving each element of the standing inquiry. *Lujan*, 504 U.S. at 561. "[E]ach element must be supported in the same way as any other matter on which plaintiff bears the burden of proof." *Id.* Because the matter was decided below on cross-motions for judgment on a stipulated record, Appellants were required to identify specific facts in the stipulated record that support a finding that a sectarian school to which they would send their children was "likely" to accept public funds. *Id.; see also Boston Five Cents Sav. Bank v. Sec'y of the Dep't of Housing and Urban Dev.*, 768 F.2d 5, 11-12 (1st Cir. 1985) (difference between a decision on a stipulated record and motion for summary judgment is that the former allows the judge to decide any issue of material fact they discover while the latter does not). They did not make such a showing, either

---

[3] The District Court acknowledged the ability of this Court to reconsider the standing issue:

> [t]he defendant says that [lack of redressability] was not presented to the First Circuit in *Eulitt*. If that is so, it may be a basis for persuading the First Circuit to abandon its standing decision in *Eulitt*. But I take the *Eulitt* precedent and language as they are.

Joint App. at 99, n. 12.

with respect to the two sectarian schools to which Appellants send, or wish to send, their children, or with respect to *any* sectarian school.[4]

In contrast, the Commissioner – who bears no burden whatsoever – presented evidence that even if this Court were to rule in Appellants' favor and hold that Maine cannot refuse to approve sectarian schools for the receipt of public funds, it is *unlikely* that the schools to which the Appellants wish to send their children would then agree to accept public funds. BCS testified that it would consider accepting public funds only if it did not have to make "any changes in how it operates." JSF, ¶ 127. Even then, there is "no way to predict" whether BCS' governing body – the Deacon Board of Crosspoint Church – would approve accepting public funds. JSF, ¶ 128. Similarly, TA would refuse to accept public money if it meant that it could no longer exclude homosexuals from teaching positions. JSF, ¶ 184. And even if TA had "in writing" that it would not have to alter its admission standards, hiring criteria, or curriculum, it would then only *consider* whether to accept public money. JSF, ¶ 182.

---

[4] The fact that Appellants offered no affidavits from the schools attesting to their intent to apply for public funds is telling inasmuch as the Appellants and the schools are not strangers to each other. Beyond that the Appellants' children attend the schools, one of the schools – BCS – assisted Appellants' counsel in recruiting families to serve as plaintiffs. *See* Docket Item 24-6, PageID 304-05. Presumably, if BCS could, in good faith, have provided an affidavit to Appellants to assist them in establishing standing, it would have done so.

Accepting public funds would result in a significant change to how BCS and TA operate – at the very least, they likely would no longer be free to refuse to hire homosexuals. Under the Maine Human Rights Act ("MHRA"), it is unlawful to refuse to hire a person because of his or her sexual orientation. 5 M.R.S. § 4572(1)(A). While there is an exception that allows religious organizations to discriminate against homosexuals, it applies only to religious organizations "that do[] not receive public funds." 5 M.R.S. § 4553(10)(G). Given BCS' and TA's firm stances against hiring homosexuals, it is unlikely that either school would agree to accept public funds. And even if BCS and TA could still somehow discriminate against homosexuals despite taking public funds and did not have to change any of their other practices, they still would only "consider" accepting public funds. Because it is, at best, entirely speculative as to whether a favorable ruling would result in the school administrative units where Appellants reside making tuition payments on behalf of the Appellants' children, Appellants lack standing. [5]

---

[5] Below, Appellants relied on just two cases that they argued demonstrate that the Supreme Court has found that plaintiffs had standing even when they could not prove they would necessarily receive a tangible benefit if they prevailed. Both are inapposite because neither involves the discretionary decision of a third party. In *Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656 (1993), the plaintiffs challenged a city ordinance giving preference to minority-owned businesses in the award of city contracts. The Supreme Court held that to have standing, a plaintiff did not need to prove that it would receive a contract if the ordinance were struck down but instead "need only

## II.    This Court is bound by the First Circuit's decision in *Eulitt* with respect to the free exercise, equal protection and free speech claims.

Even if the Appellants have standing to bring their claims, almost all of them – the alleged violations of the Free Exercise Clause, the Equal Protection Clause, and the Free Speech Clause – have already been decided in the State's favor by this Court in *Eulitt*.  "The 'law of the circuit' rule is a subset of stare decisis. It is one of the building blocks on which the federal judicial system rests. Under the rule, newly constituted panels in a multi-panel circuit court are bound by prior panel decisions that are closely on point."  *San Juan Cable LLC v. Puerto Rico Tel. Co.*, 612 F.3d 25, 33 (1st Cir. 2010); *see also Eulitt*, 386 F.3d at 349 ("Ordinarily, newly constituted panels in a multi-panel circuit should consider themselves bound by prior panel decisions.").  While this Court has identified two exceptions to this rule, neither is applicable here.

---

demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."  *Id*. at 666.  The plaintiffs were the objects of the regulation, and, in such cases, there is "ordinarily little question" that a favorable judgment will redress the injury.  *Lujan*, 504 U.S. at 561-62.  The other case cited by Appellants – *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) – involved a challenge to a "structured dismissal" of a bankruptcy case that violated priority rules by paying general unsecured creditors over creditors with higher priority.  The Supreme Court held that even though the higher priority creditors ultimately might not receive any money, they nevertheless had standing to challenge the dismissal because there was a "reasonable possibility" that they could obtain money through a settlement and/or through a fraudulent conveyance lawsuit.  *Id*. at 983.  There is nothing in the opinion suggesting that the creditors' ability to obtain effective relief turned wholly on purely discretionary decisions by third parties.

The first exception, when a panel opinion has been "undermined by a subsequently announced controlling authority, such as a decision by the Supreme Court" is easily dispensed with. *Eulitt*, 386 F.3d at 349.  Nothing in *Trinity Lutheran* holds that the Free Exercise Clause, the Equal Protection Clause or the Free Speech Clause requires a state to fund religious activity merely because it funds the secular equivalent of that activity.

The second exception, "when recent Supreme Court precedent calls into legitimate question a prior holding of an inferior court" requires "a reviewing court [to] pause to consider the likely significance of the neoteric Supreme Court caselaw before automatically ceding the filed to an earlier decision." *Id.* at 350.  Such an examination leads to only one conclusion:  *Trinity Lutheran* has not called *Eulitt* into question.

First, the *Trinity Lutheran* decision is explicitly limited:  footnote three of the opinion (adopted by four members of the majority) states that "[t]his case involves express discrimination based on religious identity with respect to playground resurfacing.  We do not address religious uses of funding or other forms of discrimination."  137 S. Ct. at 2024, n.3.  That footnote is controlling because it sets forth narrower grounds for the judgment than the analysis of the two Justices who joined the body of the majority opinion, but not the footnote.  *Marks v. United States,* 430 U.S. 188, 193 (1977) (in a fragmented decision "the holding

25

of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"). Justice Breyer's concurring opinion begins by stating that "I find relevant, and would emphasize, the particular nature of the 'public benefit' here at issue" and concludes that "[p]ublic benefits come in many shapes and sizes. I would leave the application of the Free Exercise Clause to other kinds of public benefits for another day." 137 S. Ct. at 2026-27. In sum, five of the seven justices who agreed that it violated the Free Exercise Clause to exclude religious entities from a playground resurfacing program plainly stated that their holding was limited to that specific program and did not address religious uses of funding.[6]

Second, *Trinity Lutheran* did not undercut or limit *Locke v. Davey*. Far from "erect[ing] a fence" around *Locke*, or "cabin[ing]" *Locke* only to a state's interest

---

[6]Those limits were reinforced in *Freedom From Religion Found. v. Morris Cty. Bd. of Chosen Freeholders*, 181 A.3d 992 (N.J. 2018), *cert. denied*, 139 S. Ct. 909 (2019), where the Supreme Court let stand the New Jersey Supreme Court's conclusion that a state program that awarded public funds for the repair of churches violated a provision in the state's constitution declaring that no person could be obliged to pay taxes for the building or repairing of churches. *Id*. at 1006. The New Jersey court noted that *Trinity Lutheran* did not address whether its holding – that an otherwise qualified religious entity cannot be denied public funds solely because of its religious character – "extends to religious uses of funding." *Id*. at 1008. As "[t]he holding of *Trinity Lutheran* does not encompass the direct use of taxpayer funds to repair churches and thereby sustain religious worship activities," the court held that the constitutional provision prohibiting the use of public funds to build or repair churches did not violate the Free Exercise Clause. *Id*. at 1012.

in not funding the training of ministers, App. Br. at 12, 26, *Trinity Lutheran* continues to recognize the distinction between a state program that discriminates based on the status of a would-be participant and a state program that restricts all participants from using public funds for a particular activity.

*Trinity Lutheran* and *Locke* address different scenarios with correspondingly different levels of judicial scrutiny. On one hand is a situation where the religious are singled out because of their religious status and denied access to a generally available public benefit program that does not implicate antiestablishment interests (*e.g.* the categorical exclusion of churches because they are churches from a program that provides scrap tire for playground resurfacing as in *Trinity Lutheran*). On the other is a limit on all persons, religious or not, from using public money to fund an "essentially religious endeavor" that triggers traditional state antiestablishment interests (*e.g.* a program that prohibits everyone, religious or not, from using public funds to pay for a degree in devotional theology as in *Locke*). In at least two ways, Maine's tuition program is a better example of this principle than *Locke* itself: parents in Maine seeking to obtain a sectarian education for their children are less likely to be religiously motivated than individuals pursuing degrees in devotional theology, and Maine's antiestablishment interest in its publicly funded K-12 education system is far greater than its interest in the funding of post-secondary education. *See infra* at n. 8 and p. 33.

27

Finally, Appellants provide no explanation as to how *Trinity Lutheran* could have impacted *Eulitt* with respect to their equal protection or free speech claims given that the *Trinity Lutheran* decision addressed only a free exercise claim.  With respect to equal protection, such a claim continues to be governed by the rational basis standard outlined in *Locke* and *Eulitt*, which the *Eulitt* plaintiffs conceded that the State met.  Concession aside, this Court explained:

> This concession is understandable:  the legislative history clearly indicates Maine's reasons for excluding religious schools from education plans that extend public funding to private schools for the provision of secular education to Maine students.  These reasons include Maine's interests in concentrating limited state funds on its goal of providing secular education, avoiding entanglement, and allaying concerns about accountability that undoubtedly would accompany state oversight of parochial school's curricula and policies (especially those pertaining to admission, religious tolerance, and participation in religious activities).

*Eulitt*, 386 F.3d at 356.

And as to speech, the *Eulitt* Court concluded:

> The statute at issue here does not implicate the appellants' speech rights at all.  As the Supreme Court made clear in *Davey*, state programs to fund general tuition costs are not fora for speech.  The Maine education plan deals with the provision of secular secondary educational instruction to its residents; it does not commit to providing any open forum to encourage diverse views from private speakers.

*Id.* at 356 (internal citation omitted).

III.    **Maine's decision to maintain a secular public education system does not violate the Free Exercise Clause.**

If the Court were to reach the merits, the Appellants' claims fail. The sole development in the law that has caused Appellants to revisit the constitutionality of Section 2951(2) is the Supreme Court's decision in *Trinity Lutheran.* Yet nothing in *Trinity Lutheran* suggests that Maine no longer has the authority to develop and implement a secular system of public education that relies, in limited circumstances, on secular private schools in lieu of building public secondary schools, without simultaneously funding private sectarian schools. The ongoing vitality of the Court's decision in *Locke v. Davey* evidences a continued judicial respect for a state's decision to elect not to financially support what is an essentially religious endeavor – a form of education aimed at inculcating students in a particular faith to the exclusion of all others and where a single faith is integrated into every subject taught – while supporting and maintaining a statewide system of secular public education.

*Trinity Lutheran* involved the Missouri Department of Natural Resources' Scrap Tire Program. This government program gave competitive grants to "help public and private schools, nonprofit daycare centers, and other nonprofit entities purchase rubber playground surfaces made from recycled tires." 137 S. Ct. at 2017. The program had a policy that categorically disqualified churches and other religious organizations from receiving grants to resurface their playgrounds. *Id.*

29

The Department believed such a policy was compelled by a provision in the Missouri constitution that prohibited any public money from being taken from the public treasury "in aid of any church." *Id.*

The parties in *Trinity Lutheran* agreed that the Establishment Clause did not prevent the Department from including the church's preschool in the Scrap Tire Program, leaving the Court to decide whether Trinity Lutheran's exclusion violated the Free Exercise Clause or whether it fell within the "'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Id.* at 2019 (citing *Locke* at 718). It is this "play in the joints" that caused the Court in *Locke* to uphold a Washington state scholarship program for low income students that prohibited recipients from using the scholarship to pursue a degree in devotional theology. *Locke*, 540 U.S. at 718-21.

The *Trinity Lutheran* Court held that the church's exclusion from the Scrap Tire Program violated the Free Exercise Clause because it disqualified an otherwise fully qualified applicant from consideration for a generally available public benefit merely because it was a religious institution. 137 S. Ct. at 2024. It distinguished the exclusion from the Scrap Tire Program from the scholarship restriction upheld in *Locke v. Davey* by noting that nothing in the scholarship program required Davey to choose between his religious beliefs and receiving a

30

scholarship; instead he was denied a scholarship because of what he proposed to do with the money, *i.e.* prepare for the ministry. *Id.* at 2023-24.

### A. Unlike Trinity Lutheran Church, Appellants and their chosen schools are not "otherwise fully qualified" for a "generally available public benefit."

Consistent with Justice Breyer's observation in *Trinity Lutheran* that "[p]ublic benefits come in many shapes and sizes," *id.* at 2026-27, in order to properly analyze Appellants' claim, it is essential to start by identifying the public benefit bestowed by the tuition program: a free public education. 20-A M.R.S. § 2(1). As this Court has previously stated, that free public education is a secular education. *Eulitt*, 386 F.3d at 355 (the "benefit offered by the state" is "a secular education"). It is equally important to state what Maine's tuition program is *not*: a "voucher" or "school choice" program where parents are given the opportunity to select a school other than the public school that their student would otherwise attend. *See, e.g., Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (vouchers made available to parents seeking to flee Cleveland's demonstrably failing public schools).

Each school administrative unit in Maine is charged with providing a public education in one of three ways: operating a public school, contracting with a public or approved private school for schooling privileges, or paying tuition to the public or approved private school of the parent's choice. 20-A M.R.S. §§ 1001(8),

5204(4). There is no dispute that students who receive a public education from a public secondary school receive a non-sectarian education, and that if Appellants resided in an SAU that operated a public high school they would not be entitled to a sectarian education at public expense. Nor is there any dispute that students who receive a public education pursuant to a contract between their SAU and a public or approved private school receive a non-sectarian education, and that if Appellants resided in an SAU that had a contract for secondary school privileges they would not be entitled to a sectarian education at public expense. With respect to the third option, Maine's Law Court has explained:

> The Legislature endeavors to ensure that each child will be entitled to an *opportunity* to receive a free public education, not to guarantee children a free education at any public or private school of their choice. Within the statutory scheme, section 5204(4)'s function is limited to authorizing the provision of tuition subsidies to the parents of children who live within school administrative units that simply do not have the resources to operate a public school system, and whose children would otherwise not be given an opportunity to receive a free public education.

*Hallissey v. Sch. Admin. Dist. No. 77*, 755 A.2d 1068, 1073, 2000 ME 143 (emphasis in original). Thus, the tuition program is simply a vehicle for students in this third category to receive a free public education that is consistent with, and no broader than, the benefit provided by the first two options.

No case has ever held, or even suggested, that a state's decision to define a public education to mean a secular education raises any constitutional concerns.

This is unsurprising given the considerable state interest in public education as well as the primary role of the state in this area. *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("providing public schools ranks at the very apex of the function of a State"); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 39 (1973) (with respect to public education, a state's efforts "should be scrutinized under judicial principles sensitive to the nature of the State's efforts and to the rights reserved to the States under the Constitution"). A free, public education has long been equated with a secular instruction. *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("Free public education, if faithful to the ideal of secular instruction . . . will not be partisan or enemy of any . . . creed").

With the public benefit clearly defined, the holes in the Appellants' free exercise claim become readily apparent. Appellants' brief brazenly ignores both this Court's and the Law Court's description of the public benefit Appellants are claiming to have been denied and proceeds as if the benefit is the ability to use public funds to purchase any education of the parents choosing.[7] App. Br. at 13.

---

[7] Below, Appellants made two arguments that the benefit could not be a free public education, only one of which bears mention. Appellants' argument that the benefit cannot be a free public education because the private schools in the tuition program do not have to accept every student who applies displays a basic lack of knowledge of Maine's public education system. Maine has two *public* magnet schools where students apply to go to receive their free public education, each of which can select a class from the students who apply. *See* 20-A M.R.S. §§ 8201, 8205(11) (Maine School of Science and Mathematics); §§ 8231, 8235(11) (Maine School for Marine Science, Technology, Transportation, and Engineering). In addition, Maine has

There is no support in either the case law or the stipulated record for Appellants'
position. Simply put, they are not seeking to participate in an "otherwise available
benefit program."  They are seeking a different public benefit:  a publicly funded
sectarian education.  Unlike Trinity Lutheran Church, which wanted to obtain
public funds for the same type of safety upgrade for its playground surface as the
non-church applicants, these parents are looking for public funds for a completely
different purpose:  a pervasively sectarian education as opposed to a public
education.

As the stipulated facts make clear, the education at the sectarian schools for
which Appellants seek public funds is nothing like the education at public schools,
or private secular schools.  As the representative of TA candidly testified, there is a
"big difference" between private schools and private Christian schools.  JSF, ¶ 141.
And as described by the Supreme Court, "'[t]he affirmative if not dominant policy'
of the instruction in pre-college church schools is 'to assure future adherents to a
particular faith by having control of their total education at an early age.'"  *Tilton
v. Richardson*, 403 U.S. 672, 685-86 (1971) (quoting *Walz v. Tax Comm'r of City
of New York*, 397 U.S. 664, 671 (1970)).

---

nine *public* charter schools:  schools of choice which can cap enrollment at a
predetermined number.  20-A M.R.S. §§ 2401(9), 2402, 2404(2).  In short, a free
public education clearly incorporates schools that do not have to accept every
student who applies.

BCS is a ministry of Crosspoint Church with the objective of "training young men and women to serve the Lord." JSF, ¶ 70. The School will only admit students who are willing to support BCS' philosophy of Christian education and conduct. JSF, ¶ 88. BCS believes that a student who is homosexual or identifies as a gender other than that on his or her birth certificate could not sign the agreement governing codes of conduct that BCS requires as a condition of admission. JSF, ¶ 89. A student who has been admitted, but subsequently presents him or herself as homosexual, or as a gender other than that on his or her birth certificate, would not be allowed to continue attending BCS. JSF, ¶¶ 90-92.

BCS does not believe that there is any way to separate the religious instruction from the academic instruction. JSF, ¶ 101. Religious instruction is "completely intertwined." *Id.* Among the objectives of BCS are teaching students to be good Christians, promoting Christian values, and developing Christian leadership. JSF, ¶ 95. BCS teaches students they should spread Christianity in the world. JSF, ¶ 104. This includes teaching children that the Bible is the word of God, that it is infallible, and that it should be obeyed in every aspect of life. JSF, ¶ 169.

TA is an "integral ministry" and essentially an "extension" of Centerpoint Community Church. JSF, ¶ 134. The Academy will not admit homosexual students or students who identify with a gender that is different than what is listed

on his or her birth certificate.  JSF, ¶¶ 157-58.  It will not admit a child who lives in a two-father or two-mother family.  JSF, ¶ 159.

TA provides a "biblically-integrated education" where teachers "are expected to integrate Biblical principles with their teaching in every subject taught."  JSF, ¶¶ 164, 168.  TA teaches children that the Bible is the Word of God, that it is infallible, and that is should be obeyed in every aspect of life.  JSF, ¶ 169.  TA seeks to "mold" students to be "Christlike."  JSF, ¶ 173.  TA teaches students that they should attempt to spread the word of Christianity.  JSF, ¶171.

> *B. Unlike Trinity Lutheran Church, Appellants are not being denied participation in the tuition program because of who they are, but because of what they seek to do with the public funds.*

Despite Appellants' efforts to complicate the issue, the difference between "status" and "use," a critical distinction between *Trinity Lutheran* and *Locke*, can be explained simply.  If Maine's statute prevented Christians from receiving a publicly funded secondary education, but allowed non-Christians to receive one, that would be discrimination based on an individual's religious status.  On the other hand, if Maine's statute allows everyone, religious or not, to receive a publicly funded secular education, and prevents everyone, religious or not, from receiving a publicly funded sectarian education, it not an issue of "status" but rather an issue of "use."

The first example was the situation addressed by the Supreme Court in *Trinity Lutheran.* The Missouri Scrap Tire Program provided state grants to replace old playground surfaces with scrap tire. Trinity Lutheran church wanted to replace its old playground surface with scrap tire but was disqualified from receiving a grant through the Scrap Tire Program solely because it was a church. Simply put, Trinity Lutheran was rejected because of who it was (*i.e.* its status as a church), and not because of what it wanted to do (obtain scrap tires for its playground), which was exactly the same thing that the non-church applicants wanted to do.

The second example was the situation addressed by the Supreme Court in *Locke v. Davey.* The Promise Scholarship Program helped academically gifted students working toward undergraduate degrees but excluded degrees in devotional theology. Davey was a deeply religious person who wanted to apply his scholarship to a degree in devotional theology. He was denied not because he was a religious person, but because under the terms of the program, no undergraduate student in Washington was able to apply a Promise Scholarship to a degree in devotional theology. In other words, he was denied not because of who he was, but because of what he wanted to do. The second example also exactly describes Maine's tuition program.

Appellants reason that because the "Sectarian Exclusion" (their term) is triggered by their desire to have their children educated in schools whose worldviews align with their sincerely held religious beliefs, and because their beliefs are part of their religious status, the statute must necessarily discriminate based on status.  This reasoning is both circular and wrong.  At the outset, the parents all freely acknowledge that their religion does not require them to reject non-sectarian schools.  JSF, ¶¶ 36-37, 51-52, 60.  Moreover, whether Appellants are religious or whether their desire to choose a sectarian school for their children is motivated by their sincere religious beliefs is wholly immaterial with respect to the tuition program.  While Appellants testified that they would like to choose a sectarian school because it provides a high quality education and is consistent with their religious beliefs, a non-religious parent who wishes to send her son to a nearby Catholic high school because she believes it has strong disciplinary policies and her son wants to play on the hockey team would also be prevented from doing so.  Maine's tuition program hinges not on who a parent is, but on what he or she wishes to purchase with public funds.[8]

_____

[8] Appellants' attempt to equate faith and action and also distinguish *Locke* from the instant case lacks credulity. None of the cases cited by Appellants come close to the unity of faith and action described in *Locke*.  Surely an aspiring minister such as Mr. Davey is the gold standard for the unity of faith and action – the Supreme Court referred to it as "akin to a religious calling" – but that still did not entitle him to use a Promise Scholarship for a degree in devotional theology because nobody,

Nor are the sectarian schools being denied participation in the tuition program because they are operated by churches. Unlike Trinity Lutheran Church, which intended to use the public money for the same secular purpose as the non-church applicants, this case seeks to compel Maine to fund explicitly religious activity. Sectarian schools are denied funds not because of who they are but because of what they would do with the money – use it to further the religious purposes of inculcation and proselytization. JSF, ¶¶ 95, 96, 104, 145, 147, 171, 174.

C. *The tuition program does not reflect hostility or animus toward religion.*

Appellants' brief is permeated with assertions that the tuition program is hostile to religion and the product of religious animus. *See, e.g.,* App. Br. at 20. The portions of the record they cite to, though, belie these assertions. For example, not wanting to "fund discrimination" or the teaching of "intolerant" views does not demonstrate a hostility to religion. Rather, it demonstrates a hostility to discrimination and intolerance. BCS and TA candidly admit that they discriminate against homosexuals, individuals who are transgender, and non-Christians with respect to both who they admit as students and who they hire as teachers and staff. As discussed above, the purpose of the tuition program is to provide a free public

religious or not, could use their scholarship to pursue a degree in devotional theology.

education, *i.e.*, a secular education.  It is not evidence of animus, then, to not want to include in the program schools whose overwhelming mission is religious.

Appellants' arguments about the State's rationale for maintaining a secular public education system misstate both the law and the facts and ignore this Court's precedent.  Legally, it does not matter whether there was evidence of the Legislature's actual reasons for excluding sectarian schools from the public tuition program.  *See, e.g., F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."); *see also Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 214 (1st Cir. 2002).[9]  As a matter of fact, there is evidence of the Legislature's rationale, in the form of statements made by legislators while considering (and rejecting) a repeal of the exclusion.  JSF, ¶¶ 189-202.  There is no reason to treat these statements differently simply because they were offered as reasons not to repeal the exclusion as opposed to reasons for implementing the exclusion in the

---

[9] The case relied upon by the plaintiffs -- *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) – is not to the contrary.  There, the Supreme Court held that it would not "accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose *could not have been a goal* of the legislation."  *Id*. at 648 n. 16 (emphasis added).  Here, there is no evidence that the proffered reasons could not have been the Legislature's goals.

first place.  And there is no basis for ignoring this Court's findings that "[t]here is not a shred of evidence than any . . . animus fueled the enactment of the challenged Maine statute" and in reference to *Locke*'s "test for smoking out anti-religious animus . . . the statute here passes . . . with flying colors."  386 F.3d at 355.[10]

## IV.    Maine's tuition program does not violate the Equal Protection Clause.

Appellants' equal protection claim was decided in the State's favor in *Eulitt* and not addressed at all in *Trinity Lutheran*.  On appeal, it has been reduced to the final section of Appellants' argument.

As explained in the free exercise discussion above, the resolution of the equal protection claim hinges on correctly identifying the governmental program or benefit that Appellants are arguing is being administered in a discriminatory manner.  The benefit is access to a free public education, and not an education of the parent's choosing.  *Hallissey,* 755 A.2d at 1073, 2000 ME 143, ¶ 16.

Appellants are not being treated differently than other families because they are religious, or because they would prefer a sectarian education to a non-sectarian one for their children.  Their children have the same right to a free public education as any other child who resides in their respective towns.  All parents have the same options available to them for obtaining a public education, and conversely, no

---

[10] As such, there is no basis for Appellants' inflammatory reference to *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n.*, 138 S. Ct. 1719, 1731 (2018).

family in their respective towns, whether they identify as religious or not, or whether they would like to send their children to a sectarian school or not, has the opportunity to obtain a sectarian education at public expense.  Simply put, every family has the same choice:  obtain a secular education for their children at public expense or obtain a sectarian education for their children at private expense.

Moreover, as explained by the Supreme Court in *Locke* and the Court of Appeals in *Eulitt*, the conclusion that the tuition program does not violate the Free Exercise Clause effectively forecloses any religious discrimination claim and leaves the statute subject to rational basis review.   Copies of the official Legislative Record quoted in the Joint Stipulated Facts provide insight into the specific rationales of the Legislature in deciding to retain Section 2951(2), each of which provides a rational policy basis for the decision:

- It is the sovereign prerogative of the people of the State of Maine to determine how public funds can and should be used in supporting public education for the children of this state.  JSF, ¶ 193.

- Maine has a high performing system of public education, and there is no need to add to or change it.  JSF, ¶ 192; Docket Item 24-2, PageID 192.

- Bringing all of our children together, no matter what their religious affiliation or background, promotes democracy, tolerance, and what is best in all of us.  JSF, ¶ 201.

- A publicly funded education system works best when the education is one of diversity and assimilation, religiously neutral, and not a "separate and sectarian" one.  JSF, ¶¶ 196, 201.

- The government has an important oversight role with respect to what is taught in schools but cannot, and should not, oversee the religious components of any school. Because of that, public funds should not pay for an education over which the state cannot have oversight. JSF, ¶¶ 194, 201.

- Religious schools can, and reserve the right to, discriminate in favor of those of their own religion and the state should not fund discrimination. JSF, ¶¶ 193-94.

Section 2951(2) does not violate the Equal Protection Clause.[11]

## V. Appellants' remaining claims are without merit.

Appellants raise two additional claims that have nothing to do with the

*Trinity Lutheran* decision and require only brief mention. As the First Circuit

found in *Eulitt*, the Maine tuition program does not implicate the free speech

provision of the First Amendment at all because it is not providing a forum to

encourage diverse views from private speakers. Rather, it is ensuring the provision

---

[11] Appellants' reliance on *Christian Science Reading Room Jointly Maintained*, 784 F.2d 1010 (9th Cir. 1986) is misplaced. There, the Ninth Circuit concluded that the airport authority's *only* justification for excluding religious organizations was to avoid violating the Establishment Clause. *Id*. at 1013. The court held that because the Establishment Clause did not require the exclusion of religious organizations, the authority's policy did not rationally further its purpose of avoiding a constitutional violation. *Id*. at 1016. Here, on the other hand, this Court concluded that Section 2951(2) furthers interests wholly apart from avoiding Establishment Clause violations, *Eulitt*, 386 F.3d at 356, and the legislative history supports that conclusion. JSF, ¶¶ 198-202.

of a secular public education from speakers who are willing to deliver it through compliance with Section 2951. *Eulitt*, 386 F.3d at 356.

Lastly, Appellants' argument with respect to the Establishment Clause is completely baseless. This Court rejected the parents' argument that Maine's tuition program violated the Establishment Clause 20 years ago in *Strout*, stating:

> [W]e are at a loss to understand why plaintiff-appellants believe that the Establishment Clause gives them a basis for recovery. The Establishment Clause forbids the making of a law respecting the establishment of any religion. There is *no* relevant precedent for using its negative prohibition as a basis for extending the right of a religiously affiliated group to secure state subsidies.

178 F.3d 57, 64. All of the cases cited in Appellants' brief precede *Strout*, and were thus available for this Court to consider in making its determination. And nothing in *American Legion v. American Humanist Association,* 139 S. Ct. 2067 (2019) bears on the issue of exclusion – the case was about whether maintaining a 32 foot Latin cross on government property with government funds violated the Establishment Clause, not removing it.

There can be no doubt that the exclusion of sectarian schools from the tuition program serves a secular purpose:  the sole purpose of the tuition program is to provide a free public education for students who live in towns that do not operate secondary schools or contract for school services. Appellants argue that Section 2951(2) violates the Establishment Clause because, according to them, it

44

has the "primary effect" of "inhibiting religion." App. Br. at 37-38. Appellants cite no precedent supporting the novel proposition that refusing to fund sectarian schools somehow inhibits religion. Nor does such a proposition make any sense. Appellants are free to practice their religion however they see fit. There is no evidence in the record suggesting that the Appellants' religion requires them to send their children to religious schools. But even if attending a religious school were a necessary part of a person's religion, that would not mean that the State would be inhibiting religion if it failed to subsidize it.

Nor does Section 2951(2) violate the Establishment Clause by "excessively entangle[ing] the State with religion." App. Br. at 38-39. Maine does not examine the religious beliefs or practices of a school seeking public funds, and Appellants point to no evidence to the contrary.[12] Rather, Maine simply looks at whether the school promotes a particular faith and/or teaches through the lens of that faith. *See* Def.'s Answers to Ints., ¶ 7 (Docket Item 24-3, PageID 222). Schools generally self-identify themselves, and, if there is ever a question, the determination of

---

[12] The only evidence of "entanglement" Appellants cite are two instances in which a Department of Education official asked a school whether chapel services were mandatory and whether chapel was a religious service. App. Br. at 39. After a school representative explained that chapel services were mandatory but that the services were not religious, the school was approved. *See* Docket Item 24-2, PageID 175-182.

whether a school is secular could readily be made by looking at objective factors such as mandatory attendance at religious services and course curricula.

Appellants' assertion that the *Zelman* holding – that it is possible for a state to develop a "voucher" program that includes sectarian schools without violating the Establishment Clause – also implicitly includes the negative, that a state cannot have a voucher program that excludes religious schools, is simply wrong. *Zelman* says nothing about what a state must do, only what it may do. 536 U.S. at 662-63. No court has ever suggested that a state's decision to have a religiously neutral public education system implicates the Establishment Clause. "The fact that the state cannot interfere with a parent's fundamental right to choose religious education for his or her child does not mean that the state must fund that choice." *Eulitt*, 386 F.3d at 354 (citing *Maher v. Roe*, 432 U.S. 464, 475-77 (1977)) (fundamental right to abortion does not equate to a right to a state-financed abortion). To the extent there are any Establishment Clause concerns with respect to the tuition program, they weigh in favor of the State. As this Court observed in *Eulitt*, "[e]ven after *Zelman* and *Davey*, it is fairly debatable whether or not the Maine tuition program could survive an Establishment Clause challenge if the state eliminated section 2951(2) and allowed sectarian schools to receive tuition funds." 386 F.3d at 349.

# CONCLUSION

For all the above reasons and based on the stipulated facts, Appellee respectfully requests that this Court affirm the ruling of the District Court and hold for the third time that section 2951(2) is fully constitutional.

Dated:  October 30, 2019              A. PENDER MAKIN
                                      By her attorneys:

                                      AARON M. FREY
                                      Attorney General

                                      /s/ Sarah A. Forster
                                      SARAH A. FORSTER
                                      CHRISTOPHER C. TAUB
                                      Assistant Attorneys General
                                      Office of the Attorney General
                                      Six State House Station
                                      Augusta, Maine  04333-0006
                                      Tel.  (207) 626-8866
                                      sarah.forster@maine.gov
                                      christopher.c.taub@maine.gov

## **BRIEF FORMAT CERTIFICATION**

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(B) and (g), I certify that the text of this brief is typed in Times New Roman typeface, at 14 points, is double spaced, except as permitted by Rule 32(a)(4), and according to the word count of the Microsoft Word 365 program used to prepare this brief, it contains 11,836 words, excluding the parts of the document exempted by Rule 32(f), less than the 13,000 words permitted by Rule 32(a)(7)(B)(i).


Dated:  October 30, 2019                    /s/ Sarah A. Forster
                                            SARAH A. FORSTER
                                            Assistant Attorney General

                                            Attorney for Defendant-Appellee

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. App. P. 25(d), I, Sarah A. Forster, Assistant Attorney

General for the State of Maine, hereby certify that on this, the 30th day of October,

2019, I filed the above brief electronically via the ECF system.  I further certify

that on this, the 30th day of October, 2019, I served the above brief electronically

on the following parties, who are ECF Filers, via the Notice of Docket Activity:

Timothy D. Keller
tkeller@ij.org

Arif Panju
apanju@ij.org

Lea Patterson
lepatterson@firstliberty.org

Jeffrey T. Edwards
jedwards@preti.com

Michael K. Whitehead
mike@thewhiteheadfirm.com

Jonathan R. Whitehead
jon@whiteheadlawllc.com


Dated:  October 30, 2019                    /s/ Sarah A. Forster
                                            SARAH A. FORSTER
                                            Assistant Attorney General
                                            Office of the Attorney General
                                            6 State House Station
                                            Augusta, ME 04333-0006
                                            Tel. (207) 626-8866
                                            sarah.forster@maine.gov